## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) Case No. 19-18459 MER |
| | ) |
| Frictionless World, LLC | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| | ) |
| Frictionless World, LLC, | ) |
| | ) |
| Plaintiff, | ) Adversary Proceeding No. 19-01282 MER |
| | ) |
| v. | ) |
| | ) |
| Frictionless, LLC; Changzhou Inter Universal Machine & Equipment Co., Ltd.; Li Zhixiang; Changzhou Zhong Lian Investment Co., Ltd.; Serena Li; and Frank Li, | ) |
| | ) |
| Defendants. | |

## MOTION OF DEFENDANTS MINGSU LI AND JUN LI TO WITHDRAW AUTOMATIC REFERENCE TO THE BANKRUPTCY COURT, JURY DEMAND, AND RESERVATION OF RIGHTS

Defendants Mingsu Li, a/k/a Serena Li, and Jun Li, a/k/a Frank Li (collectively, "Mr. and Mrs. Li"), enter a special appearance in this case through their undersigned counsel and, subject to their reservation of all rights set forth below, respectfully request the United States District Court for the District of Colorado to enter an order withdrawing the automatic reference of this action to the United States Bankruptcy Court for the District of Colorado, solely with respect to them and to the claims asserted against them by the Debtor-Plaintiff, Frictionless World, LLC (the "Debtor"), under D.C.Colo.L.Civ.R. 84.1(a) and L.B.R. 5011-1.  In support of their motion to withdraw the automatic reference (the "Motion"), Mr. and Mrs. Li state as follows:

## Jury Demand

Mr. and Mrs. Li, in accordance with Fed.R.Bankr.P. 9015 and Fed.R.Civ.P. 38, hereby demand a jury on all issues so triable in this case.   This Jury Demand is filed without prejudice to, subject to, and while reserving all rights, as set forth below, under both this Motion, of which this Jury Demand is a part, and that certain Special Objection to the Debtor's Motion Authorizing Alternative Forms of Service on Defendants Mingsu Li and Jun Li (the "Special Objection"), filed contemporaneously herewith.  Mr. and Mrs. Li do not consent to a jury trial in the Bankruptcy Court.  Mr. and Mrs. Li also do not consent to entry of a final judgment by the Bankruptcy Court.

## Notice of Special Appearance and Reservation of All Rights

Mr. and Mrs. Li have entered a special appearance in this case, through their undersigned counsel, for the sole purposes of filing and prosecuting the Special Objection and this Motion (collectively, the "Special Documents"), to avoid a potential waiver of their ability to preserve and assert their rights and obtain the relief set forth in the Special Documents.  In filing the Special Documents, Mr. and Mrs. Li expressly reserve all defenses, including but not limited to, lack of service of process, lack of personal or subject matter jurisdiction, *forum non conveniens*, and any other defenses available to them under Fed.R.Civ.P. 12 or other applicable law.  Nothing in this Motion shall constitute or be construed as a waiver of any such rights or defenses available to Mr. and Mrs. Li.

## Record for This Motion

In accordance with L.B.R. 5011-1(a), the record for this Motion consists of the Motion and Exhibits A-I attached hereto, which are incorporated herein by reference, along with any response filed by the Debtor and any reply in support of the Motion filed by Mr. and Mrs. Li.

Active/50946640.1

## Procedural Background for This Motion

1.      The Debtor filed its above-captioned bankruptcy case (the "Case") under Chapter 11 of the Bankruptcy Code (the "Code") on September 30, 2019 (the "Petition Date").  The Debtor continues to operate its business as a debtor-in-possession.

2.      The Debtor initiated the above-captioned adversary proceeding (the "Adversary Proceeding") by filing its Complaint (the "Complaint" [Docket No. 1], a copy of which is attached hereto as Exhibit A) for Turnover of Property of the Estate, Claim Disallowance, Avoidance, Damages, and Injunctive Relief on October 9, 2019.   In addition to Mr. and Mrs. Li, the Complaint names the four other defendants (the "Other Defendants," and collectively with Mr. and Mrs. Li, the "Defendants") listed in the above caption.

3.      Prior to the Petition Date, the Other Defendants, the Debtor, and its principal, Daniel Banjo, were parties to an arbitration that arose out of the same transactions and facts as the claims asserted in the Complaint, and many of the claims asserted in the Complaint duplicate the claims that the Debtor and/or Banjo asserted, or would have asserted, in the arbitration. Accordingly, the Other Defendants filed several documents in this Adversary Proceeding that are relevant to consideration of this Motion.  Those documents include:  (a) a motion to compel the Debtor to arbitrate the Complaint [Docket No. 19] (copy attached hereto as Exhibit B); (b) a motion to dismiss under Fed. R. Civ. P. 12(b)(1) or stay this Adversary Proceeding pending arbitration [Docket No. 20] (copy attached hereto as Exhibit C); (c) a memorandum of law in support of both of the Other Defendants' motions listed above [Docket No. 22] (copy attached hereto as Exhibit D); and (d) a Declaration of Brian D. Koosed, Esq. [Docket No. 23] (copy attached hereto as Exhibit E), with documentary evidence supporting these motions.  In the Debtor's main bankruptcy case, the Other Defendants also filed a motion for relief from stay

- 3 -

[Debtor Case Docket No. 99] (copy attached hereto as Exhibit F) to allow the pending arbitration to proceed.

      4.      In the Complaint, the Debtor asserts the following claims against Mr. and Mrs. Li:

      a.      <u>First Claim:  Turnover of Property of the Estate – 11 U.S.C. § 542(a)</u>. Although this claim is brought against "All Defendants," the Debtor nowhere alleges any acts or omissions by either Mr. or Mrs. Li in their respective personal capacities.  *See* Ex. A, ¶¶ 106-110.

      b.      <u>Second Claim:  Permanent Injunction – 11 U.S.C. § 105(a)</u>.  Again, the Debtor asserts this claim against "All Defendants," but nowhere alleges any acts or omissions by either Mr. or Mrs. Li in their respective personal capacities.  *See id.* at ¶¶ 111-115.

      c.      <u>Third Claim for Relief:  Declaration that the Stay Applies to the Arbitration – 11 U.S.C. § 105(a)</u>.   The Debtor asserts this claim against "All Defendants," but the claim relates to an arbitration to which neither Mr. nor Mrs. Li is a party.  *See id.* at ¶¶ 116-120.  Additionally, the Debtor nowhere alleges in this claim any acts or omissions by Mr. or Mrs. Li in their respective personal capacities.  In any event, this claim will be rendered moot upon the Bankruptcy Court's ruling on the Other Defendants' pending motions in the Adversary Proceeding and the main bankruptcy case.  *See* Exs. B, F.

      d.      <u>Fourth Claim for Relief:  Permanent Injunction – 11 U.S.C. § 105(a)</u>.  The Debtor asserts this claim against "All Defendants," but the claim again relates to an arbitration to which neither Mr. nor Mrs. Li is a party.  *See* Ex. A, ¶¶ 121-125.  Additionally, the Debtor nowhere alleges in this claim any acts or omissions by Mr. or Mrs. Li in their respective personal capacities.  In any event, this claim will be rendered moot upon the Bankruptcy Court's ruling on

- 4 -

the Other Defendants' pending motions in the Adversary Proceeding and the main bankruptcy case.  *See* Exs. B, F.

e.      Eighth Claim for Relief:  Fraudulent Conveyance – 11 U.S.C. §§ 548(a)(1)(B) and 550(a).  The Debtor asserts this claim against all Defendants, but nowhere alleges any transfer of property to or for the benefit of Mr. or Mrs. Li, either directly or indirectly; thus, there is no discernable connection between this claim and Mr. and Mrs. Li.  The Debtor seeks an award of monetary damages on this claim.  *See* Ex. A, ¶¶ 154-166.

f.      Eleventh Claim for Relief:  Common Law Fraudulent Misrepresentation. This claim is brought against various Defendants, including Mr. and Mrs. Li individually.  The Debtor seeks an award of monetary damages on this claim.  *See* Ex. A, ¶¶ 196-215.

g.      Twelfth Claim for Relief:  Negligent Misrepresentation.   This claim is brought against various Defendants, including Mr. and Mrs. Li individually.  The Debtor seeks an award of monetary damages on this claim.  *See* Ex. A, ¶¶ 216-236.

h.      Thirteenth Claim for Relief:  Civil Conspiracy.  Although the title of this claim does not list Mr. and Mrs. Li as targets of the claim, the Debtor's allegations discuss Mr. and Mrs. Li, so it is unclear whether the Debtor intends to assert this claim against Mr. and Mrs. Li individually.  In any event, the Debtor seeks an award of monetary damages on this claim. *See* Ex. A, ¶¶ 237-241.

i.      Fourteenth Claim for Relief:  Unjust Enrichment.  This claim is brought against various Defendants, including Mr. and Mrs. Li individually.  The Debtor seeks an award of monetary damages on this claim.  *See* Ex. A, ¶¶ 242-248.

5.      Mr. and Mrs. Li are not listed as creditors in the Debtor's bankruptcy schedules. *See* Debtor Case Docket No. 1 (copy attached hereto as Exhibit G).  Neither Mr. nor Mrs. Li has

filed any claims against the Debtor, and neither of them intends to file a proof of claim in the Debtor's bankruptcy case.

6.     The Debtor has not yet served Mr. and Mrs. Li, who are citizens and residents of China, with process in this Adversary Proceeding.  On November 11, 2019, the Debtor filed a motion [Docket No. 25] (copy attached hereto as Exhibit H) (the "Service Motion") seeking authorization to serve Mr. and Mrs. Li with process by email.  Contemporaneously herewith, Mr. and Mrs. Li are filing their special objection to the Service Motion.  A copy of that special objection is attached hereto as Exhibit I.  Thus, at this time, it is uncertain when Mr. and Mrs. Li will be served with a summons regarding the Debtor's Complaint, thereby commencing this action as to them.  Nevertheless, in an abundance of caution and to avoid any possible claim that they have waived their rights to withdraw the reference of the Debtor's Complaint as to them, Mr. and Mrs. Li are filing this Motion now, while reserving all rights to object to, and without any consent to, service of process on them, or this Court's personal or subject matter jurisdiction over them or over the Debtor's claims against them in the Complaint.

## Legal Argument

**A.     Reference of the Debtor's Claims Against Mr. and Mrs. Li Must Be Withdrawn Because the Bankruptcy Court Cannot Constitutionally Enter a Final Judgment on Those Claims.**

5.     After the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), it is beyond dispute that a bankruptcy court, as a non-Article III court, does not have constitutional authority to issue a final judgment  on the types of claims brought by the Debtor against Mr. and Mrs. Li.  Accordingly, Mr. and Mrs. Li have demonstrated "cause" to withdraw the automatic reference of those claims to the Bankruptcy Court.  *See* 28 U.S.C. § 157(d).

6.     District courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

- 6 -

Bankruptcy court jurisdiction is granted through the district courts under 28 U.S.C. § 157(a), which permits the district courts to refer actions within their bankruptcy jurisdiction to the bankruptcy judges of those courts.  Here, the District Court's local rules, specifically D.C. Colo. L.Civ.R. 84.1(a), automatically refer to the Bankruptcy Court all title 11 cases and proceedings commenced in this District.  However, where the bankruptcy court does not have constitutional authority to exercise the power granted to it under 28 U.S.C. § 157, the automatic reference to the bankruptcy court conflicts with the constitutional grant of authority to the district courts and, therefore, the automatic reference must be withdrawn from the bankruptcy court.

7.      The Supreme Court in *Stern* clarified that bankruptcy courts are not constitutionally permitted to enter final judgment on private law claims asserted against parties like Mr. and Mrs. Li, who have not filed any claims against the debtor's estate.  In *Stern*, the Supreme Court held that Congress had improperly granted to non-Article III bankruptcy courts the authority to enter final judgment on state law counterclaims asserted by debtors, where such claims would not be resolved in ruling on creditors' proofs of claim and did not fall within the limited "public rights" doctrine.  *Stern*, 131 S. Ct. at 2620.

8.      This is true even though the claims were labeled as "core" proceedings under 28 U.S.C. § 157(b).  Specifically, the *Stern* Court held that the designation of a claim as core or non-core does not dictate whether a bankruptcy court has constitutional authority to enter a final judgment on that claim.   *Stern*, 131 S. Ct. at 2608 (holding that, while "§ 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on [the] counterclaim, Article III of the Constitution does not").

Active/50946640.1

9.      Rather, this determination derives  from whether the claim falls within the limited "public rights" exception, or whether it constitutes a private right that is not necessarily and fully disposed of in the claims allowance process.

10.      In *Stern*, the Supreme Court explained that while Congress can create public rights and remove those from the purview of Article III judges, it may not "'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at common law,'" or "matters 'of private right, that is, of the liability of one individual to another under the law as defined.'"  *Stern*, 131 S. Ct. at 2612 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855), and *Crowell v. Benson*, 285 U.S. 22, 51 (1932)).

11.      Public rights are those where "the claim derives from a federal regulatory scheme," or where "resolution of the claim by an expert governmental agency is deemed essential to a limited regulatory objective within the agency's authority."  *Stern*, 131 S. Ct. at 2613.  Such claims may therefore be resolved by non-Article III courts created by Congress.

12.      Private rights, on the other hand, are those that do not depend on regulatory or administrative objectives for their existence.  These claims can only be heard by bankruptcy courts when they are a necessary part of determining whether to allow a creditor's claim against the bankruptcy estate.  *Stern*, 131 S. Ct. at 2618.  When litigation claims are not  intertwined with creditor claims, and where the litigation claims instead seek to "augment the bankruptcy estate," the litigation claims may not be heard by the bankruptcy courts.  *Id.* at 2616.

13.      Thus, in *Stern*, the Supreme Court held that a debtor's tortious interference counterclaim under state common law did not fall within any of the formulations of the public rights doctrine because the claim functioned only to augment the bankruptcy estate, and was independent of the claims allowance process.  *Stern*, 131 S. Ct. at 2616-17.

Active/50946640.1

14.     Here, similarly, the Debtor's pleaded claims against Mr. and Mrs. Li in this case involve solely private rights, asserted as common law and other legal claims, brought only to augment the estate, and are not intertwined with the claims allowance process.   Indeed, neither Mr. nor Mrs. Li has filed or intends to file any claims against the Debtor's estate.

15.     Although the constitutional requirements prescribed in *Stern* may be satisfied by the bankruptcy court's submission of proposed findings of fact and conclusions of law to the district court for *de novo* review by the Article III court, withdrawal of the reference is still mandatory to confirm that such submission and review must occur.   *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173-75 (2014).  Because the Debtor's claims against Mr. and Mrs. Li cannot be finally decided by the Bankruptcy Court, withdrawal of the reference is necessary to confirm the constitutionally-required final decision by the District Court.

**B.     Protection of Mr. and Mrs. Li's Constitutional Right to a Jury Trial Constitutes "Cause" Requiring Withdrawal of the Reference of all Claims Against Them.**

16.     Although all civil proceedings arising under or related to cases under the Bankruptcy Code are referred—as an initial matter—to bankruptcy judges, that initial reference may be "withdrawn" where, as here, a defendant can show "cause."  *See* 28 U.S.C. § 157(d).

17.     It is well-settled in this District that a defendant's constitutional right to a jury trial is a sufficient basis for withdrawal of the reference as good "cause" under § 157(d). Former Chief (and now Senior) District Judge Krieger articulated the law governing this Motion as follows:

> The Seventh Amendment protects a litigant's right to a jury trial if a cause of action is legal in nature and involves a matter of "private right."  *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 n.4 (1989).  In the Tenth Circuit, a right to have a jury trial constitutes "cause" for withdrawal where the bankruptcy court is not authorized to conduct a jury trial.  In *In re Kaiser Steel Corp.*, 911 F.2d 380, 389 (10th Cir. 1990), the Tenth Circuit held that judges [*sic*, meaning "bankruptcy judges"] lack the authority to conduct jury trials.  Since the

*Kaiser* decision, § 157(e) was added, which provides that a bankruptcy judge may conduct a jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all parties. Nevertheless, this court has not authorized the bankruptcy court to conduct jury trials, and therefore cause to withdraw the reference may be shown where a party has a Seventh Amendment right to a jury trial and a timely demand is made.

*In re Kelley*, 2016 WL 3475196 at *3 n.3 (D. Colo. June 27, 2016).

18.     District Judge Moore previously applied the principle from *Kelley* in a situation nearly identical to that presented by Mr. and Mrs. Li.  In *Walters v. Turner (In re 3PL4PL),* 2015 WL 8479974 at *2 (D. Colo. Dec. 9, 2015), the plaintiff asserted—just as the Debtor alleges here—claims for monetary recovery based on alleged fraudulent transfers and common law torts (there, conversion; here, fraud, negligent misrepresentation, unjust enrichment, and perhaps civil conspiracy).  After the defendants demanded a jury and moved to withdraw the reference, the Court "agree[d] that the right to a jury trial is sufficient cause shown for the withdrawal of the reference . . . ."  *Id.  Accord In re Aichinger,* 2015 WL 790536 at **1-2 (D. Colo. Feb. 23, 2015) (jury demand by non-creditor in response to preference and fraudulent transfer claims constituted "cause" for withdrawal of reference) (Jackson, J.); *In re SVS Holdings, Inc*., Civ. Act. No. 13-cv-00169-REB (D. Colo. June 11, 2013) (available on Casemaker) (same—jury demand on fraudulent transfer claim) (Blackburn, J.).[1]

---

[1]     In the interest of full disclosure, in the only apparent decision contrary to the uniform line of authorities in this District cited above, *In re American Title Services Co.*, 2105 WL 13229210 at *3 (D. Colo. Dec. 11, 2015), when now-Chief District Judge Brimmer denied without prejudice a motion to withdraw the reference filed in conjunction with a jury trial demand, the Court held, "While the Court declines to withdraw the reference at this time, the Court notes that it will be appropriate to do so at some point in the future."  Thus, even in *American Title*, the Court ruled that, with respect to withdrawal of the reference, the issue was not *whether*, but *when* the reference would be withdrawn.  Here, certainty for the parties and vindication of Mr. and Mrs. Li's Seventh Amendment rights support a withdrawal of the reference now, leaving the Bankruptcy Court to conduct pretrial proceedings in the efficient time-honored manner, if necessary.

19.     As shown above, Mr. and Mrs. Li have demanded a jury trial on the Debtor's claims against them, subject to their reservations of jurisdictional, service of process, and other rights.  Accordingly, Mr. and Mrs. Li have a right to a jury trial.  The Debtor's Eleventh, Twelfth, Thirteenth (if applicable), and Fourteenth Claims sound in state law for fraud, negligent misrepresentation, civil conspiracy, and unjust enrichment, and all request a damage award. Those claims entitle a defendant to a jury trial under common law.  *Ross v. Bernhard*, 396 U.S. 531, 533 (1970) ("The Seventh Amendment, for example, entitled the parties to a jury trial in actions for damages to a person or property, for libel and slander, for recovery of land, and for conversion of personal property."). The Eighth Claim seeks damages for fraudulent transfers, and although the Debtor asserts no grounds for recovery against Mr. and Mrs. Li, the claims facially entitle them to a jury trial.  *In re Aichinger*, *supra* at *1 (*citing Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 43- 46 (1989)); *In re Richardson,* 2012 WL 5458860 at 2 (D. Colo. 2012) (Daniel, J.).[2]

20.     Withdrawing the reference as to all claims against Mr. and Mrs. Li would be a component of a broader, efficient administration of the claims asserted in the Complaint that is mandated by the Federal Arbitration Act and the U.S. Constitution.  The Other Defendants have moved to compel arbitration of the Debtor's Complaint in the pending arbitration that will resolve substantially all of the subject matter of the disputes between the Debtor and all Defendants.  *See* Exs. B, D, E.  Correspondingly, the Other Defendants have moved to dismiss, or at least stay, the Adversary Proceeding pending the results of the broad arbitration.  If the requested dismissal or stay were entered, there would be no further proceedings necessary

---

[2]      Although the First through Fourth Claims purport to be asserted against Mr. and Mrs. Li, those claims don't allege any actual misconduct by them and are manifestly inapplicable to them personally; consequently, they don't merit attention for purposes of this Motion.

Active/50946640.1

regarding the claims against Mr. and Mrs. Li at any time, or for at least a substantial time.  More importantly, if the time were ever to come for a jury trial in the District Court on the Debtor's claims against Mr. and Mrs. Li, that trial would be greatly simplified based on the already-developed evidentiary record in the arbitration.

21.    Mr. and Mrs. Li recognize that the practice of the District Court for the District of Colorado in circumstances similar to this case is to withdraw the automatic reference but to direct the Bankruptcy Court to conduct all pretrial proceedings subject to the submittal of a report and recommendation to the District Court in matters prior to the jury trial reserved for the District Court.  Mr. and Mrs. Li have no objection to that procedure, and would request only that the District Court conduct the pretrial conference, the trial, and all post-trial matters.

WHEREFORE, Mr. and Mrs. Li respectfully request that the District Court enter an order withdrawing the reference of this action to the Bankruptcy Court solely with respect to them and to all claims asserted against them.

Active/50946640.1

DATED:  November 25, 2019.

SHERMAN & HOWARD L.L.C.

*s/ Eric E. Johnson*
Peter A. Cal
Eric E. Johnson
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
  E-mail:  pcal@shermanhoward.com
           ejohnson@shermanhoward.com

K&L GATES LLP

*s/ Brian D. Koosed*
Brian D. Koosed
Robert T. Honeywell
1601 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 778-9204
Facsimile:  (202) 778-9100
  E-mail:  Brian.Koosed@klgates.com
           Robert.Honeywell@klgates.com

**Attorneys for Mingsu Li, a/k/a Serena Li; and
Jun Li, a/k/a Frank Li**

Active/50946640.1

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2019, I electronically filed the foregoing **MOTION OF DEFENDANTS MINGSU LI AND JUN LI TO WITHDRAW AUTOMATIC REFERENCE TO THE BANKRUPTCY COURT, JURY DEMAND, AND RESERVATION OF RIGHTS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Aaron J. Conrardy, Esq.
David Wadsworth, Esq.
David Warner, Esq.
aconrardy@wgwc-law.com
dwadsworth@wgwc-law.com
dwarner@wgwc-law.com

Thomas P. Howard
Olayinka L. Hamza
thoward@thowardlaw.com
ohamza@thowardlaw.com

Kevin S. Neiman, Esq.
kevin@ksnpc.com

Debra Piazza
dpiazza@montgomerylittle.com

Nathan G. Osborn, Esq.
nosborn@montgomerylittle.com

Alan K. Motes, Esq.
Alan.Motes@usdoj.gov

U.S. Trustee
USTPRegion19.DV.ECF@usdoj.gov

The undersigned further certifies that on November 25, 2019, a true and correct copy of the foregoing **MOTION OF DEFENDANTS MINGSU LI AND JUN LI TO WITHDRAW AUTOMATIC REFERENCE TO THE BANKRUPTCY COURT, JURY DEMAND, AND RESERVATION OF RIGHTS** was served by placing the same in the United States mail, first class postage paid on the 20 Largest Creditors, Debtor and Daniel Banjo, addressed as follows:

| | |
|---|---|
| Agtec Industries Pvt Ltd<br>38-B, Udyog Vihar, Ecotech -II<br>Greater Noida, U.P. 201306<br>India | Atlas Denver Industrial, LP<br>12001 N. Central Expressway, Suite 875<br>Dallas, TX 75243-3860 |
| Bluesea Trailer Parts Co Ltd<br>Poli Huangdo<br>Qingdao China 266000 | Changzhou Henghao Special Alloy Co., Ltd<br>No. 5-2, West Taihu Road<br>Xinbei District<br>Changzhou City JS<br>China 213000 |

Active/50946640.1

| | |
|---|---|
| Hong Kong Chinabase Intl. Grp,<br>4th Floor, B Block, Jianhua Indst. Park<br>No 207-208 Qi Gu Deng<br>Shou Shandong Road, Hangzhou<br>China 310000 | Intradin Machinery Co Huzhou<br>No. 118 Dohui Road<br>Minhang District<br>Shanghai 201109<br>China |
| Ningbo NGP Industry Co., Ltd.<br>No. 88, Lane 666 Jinshan Road<br>Czone Jianbei Investment Center<br>Ningbo China 315400 | Sinotub Industry Co Ltd<br>D-802 Pufa Plaza<br>1759 North Zhongshan Road<br>Shanghai<br>China 201000 |
| Syndigo<br>833 E. South St.<br>Stoughton, WI 53589 | Tiya International Co Ltd<br>B12B Shenye Center<br>9 Shangdong Rd<br>Qingdao 266071<br>China |
| Yongkang Legend Garden Machinery Factory<br>No. 501 Xita Road<br>Chengxi Industrial Zone<br>Yongkang City, Zhejiang Prov.<br>China 212000 | Zhejiang Kc Mechanical & Electrical<br>No. 299 East Huaxi Road<br>Gushan Yongkang<br>Zhejiang<br>China 212000 |
| Frictionless World, LLC<br>1100 W. 120th Avenue, Suite 600<br>Westminster, CO 80234-2736 | Daniel Banjo<br>2807 Jay Road<br>Boulder, CO 80301-1605 |

*s/ Roberta Neal*

Active/50946640.1

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FRICTIONLESS WORLD, LLC | ) | Case No. 19-18459 MER |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| FRICTIONLESS WORLD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 19-_____ MER |
| | ) | |
| FRICTIONLESS LLC, CHANGZHOU | ) | |
| INTER UNIVERSAL MACHINE & | ) | |
| EQUIPMENT CO., LTD, LI ZHIXIANG, | ) | |
| CHANGZHOU ZHONG LIAN | ) | |
| INVESTMENT CO. LTD., SERENA LI, | ) | |
| AND FRANK LI, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE, CLAIM DISALLOWANCE, AVOIDANCE, DAMAGES AND INJUNCTIVE RELIEF

---

Frictionless World, LLC ("FW") brings the following claims against Defendants Changzhou Inter Universal Machine & Equipment Co., Ltd. ("CIU"), Li Zhixiang ("Li"), Changzhou Zhong Lian Investment Co. LTD. ("ZL Investment"), Serena Li, and Frank Li (collectively "Li Defendants"), as well as against Defendant Frictionless, LLC, with knowledge as to FW's own acts and those of Defendants, and on information and belief as to all other matters, as follows:

## INTRODUCTION

FW was created in 2012 by its CEO and sole owner Dan Banjo, an engineer with years of experience in the industry, to manufacture and distribute to retailers professional grade outdoor equipment for household and agricultural use. Because Banjo had known the Li family and CIU since 2007, he used CIU to manufacture parts and products for FW, per FW's direction. The parties also began negotiating a joint investment venture intended to quickly expand FW's number of retail clients and total sales, thereby assisting all involved. The other parties in this venture were Li, his company CIU, an investment company Li created in 2013 called ZL Investment, and a pass-through entity jointly created by ZL Investment and Banjo to handle revenue transfers between FW and CIU called Frictionless LLC. The Operating Agreement for Frictionless LLC was entered into on April 11, 2013. Schedule B to the Operating Agreement, repeatedly referenced in the same, provides a detailed description of how the joint venture operated.

The parties operated under the clear provisions of that agreement for six years. By late 2018, FW had registered steadily increasing sales numbers since 2012 and was projecting 2019-2020 to be its best year ever, with almost $50 million in sales.

Now, 10 months later, FW finds itself in a chapter 11 bankruptcy case as a direct result of Defendants' actions. Per Defendants' requests, FW in good faith made accelerated payments to Defendants in early 2019 totaling over $4.5 million. Upon receipt of the same, Defendants breached over 250 purchase orders and ceased all shipments. Defendants' failure to ship directly resulted in FW's loss of multiple major clients it had taken years to obtain, including Lowes and Home Depot. Defendants' actions reflect an intentional effort to destroy FW as a competitor and obtain FW's clients and intellectual property.

FW now brings this action to (a) compel turnover of all property of the estate currently in the possession of Defendants, including all intellectual property, all patented product designs, all patented products, all trademarked products and all other parts and products; (b) disallow or equitably subordinate Frictionless LCC's claim; (c) avoid obligations owed and transfers made to Frictionless LLC; (d) obtain damages arising from Defendants' ongoing breaches of contract, fraud, negligent misrepresentation, and other claims; and (e) to obtain injunctive relief to (1) compel turnover as set forth above; (2) enjoin Defendants' sale, distribution, licensing or distribution, in any form, of FW's patented and trademarked property remaining in their possession as a result of their failure to ship, as contracted; and (3) stay the arbitration filed by Defendants against FW and its CEO and sole owner Daniel Banjo.

## **THE PARTIES**

1.      Plaintiff FW is a limited liability company organized and in good standing under the laws of the State of Colorado, with its principal place of business at 1100 West 120th Avenue, Suite 600, Westminster, Colorado.  FW is a chapter 11 debtor-in-possession in the underlying bankruptcy case.  Banjo is FW's sole member, founder, and CEO.

2.      On April 1, 2019, FW had almost 80 employees working to provide retailers all over the world with FW's outstanding professional-grade outdoor power equipment; high-quality affordable replacement parts for tractors, hitches and agricultural implements; gate and fence equipment; lithium-ion powered tools; and ice fishing equipment.  At this time, FW has approximately 20 employees.

3.      Defendant Li, a natural person, is a Chinese citizen and billionaire. Li owns and operates CIU and ZL Investment.  Li is a party to the Frictionless LLC Operating Agreement (hereinafter the "FOA"). *See* Exhibit 1.  During 2013-2018, Li and members of his immediate

and extended family visited FW's facility in Colorado several times per year.  Li has two children:
(1) Tracey Li; and (2) Frank Li.  Both offsprings and their spouses are heavily involved in Li's
business affairs.

4.      Defendant CIU is a company organized under the laws of China.  Its business
address is Zhaiqiao Town, Wujin, Chiangzhou, Jiangsu 21337, P.R. China.  CIU has been
assembling components for log splitters, post hole diggers, trimmers, and general farm equipment
parts for FW since 2012, long before the joint venture involving Frictionless LLC was established.
CIU never assembled such products prior to working with FW.  Li is the majority owner and
president of CIU.

5.      Defendant Serena Li is a natural person and citizen of China.  Serena Li at one-time
was a resident of the State of California. She is married to Frank Li and is therefore Li's daughter-
in-law. Defendant Serena Li is believed to be a member of both ZL Investment and CIU.  Serena
is the Chief Financial Officer ("CFO") of CIU and on May 1, 2015 was also made the CFO of
Frictionless LLC.  Serena was appointed Frictionless LLC's Manager in May 2019 after Banjo
resigned from the same position on May 3, 2019.

6.      Starting in 2015, Serena frequently communicated with FW through Banjo's email
at dbanjo@frictionlessworld.com.  Serena also personally visited FW's business office in
Westminster, Colorado to meet with FW's employees over business dealings involving FW and
the Li Defendants.  See Exhibit 2 (photographs of Serena's visit).

7.      Defendant Frank Li is a natural person and citizen of China.  Frank Li is married to
Serena Li and the parties once jointly resided in California.  Frank Li signed the FOA as ZL
Investment's General Manager.  Frank Li is an owner of ZL Investment.  Frank Li has been
familiar with the business dealings between FW and the Li Defendants since 2013, but did not

actively participate in the same until approximately 2015.

8.      Defendant ZL Investment is a Chinese company that was created by Li in 2013. ZL Investment is a member of, and owns 90% of the membership interests in, Frictionless LLC.  ZL Investment is a signatory to the FOA.  *See* Exhibit 1, in particular, Schedule A.  Upon information and belief, the ownership of ZL Investment is divided among Mr. Li, his two children, and their two spouses.

9.      Defendant Frictionless LLC is a Colorado limited liability company separate and apart from FW.   Its FEIN is 46-2674896, compared to FW's FEIN, which is 45-5285986. Frictionless LLC was formed in April 2013 to act as a pass-through vehicle for revenues arising from a sales and marketing venture between FW and CIU, both of which already existed at the time Frictionless LLC was formed and already had a long-standing business relationship.

10.     At all relevant times, Frictionless LLC had no physical location of its own, no website, no email address, and no telephone.  Up until 2015, Frictionless LLC also had no employees.  On May 1, 2015, pursuant to the terms of the FOA, Schedule B, p.11, Serena Li was designated as the CFO of Frictionless LLC.  No other party was subsequently made an officer or director of Frictionless LLC.

## RELEVANT PERSONS/NON-PARTIES

11.     Banjo, a natural person, is a Colorado citizen and the owner and operator of FW. At all relevant times, Banjo was and remains the Chief Executive Officer ("CEO") of FW.  Banjo established FW on May 14, 2012.  *See* Exhibit 3 (FW Art. of Organization).  After establishing FW, Banjo authored multiple design and utility patents for the company.  *See* Exhibit 4 (listing of patents and patent applications).  Banjo is also a member of Frictionless LLC and owns 10% of Frictionless LLC's membership interests. *See* Exhibit 1 at Schedule A.  Banjo was the Manager

of Frictionless LLC from March 1, 2013 through May 3, 2019. *See* Exhibit 5.  Banjo is a signatory

to the April 11, 2013 FOA between Frictionless LLC, Li, ZL Investment, and Banjo.  *See* Exhibit

1 at Schedule A.  Banjo's email address, business card, LinkedIn information, and all websites

related to Banjo all prominently displayed information evincing his long-standing use and

operation of FW, including the use and ownership of FW's email address

dbanjo@frictionlessworld.com.

  12. Yin Gelei ("Allen Yin"), a natural person, is a citizen of China.  Allen is married to

Li's daughter, Tracey Li, (now Tracy Yin) and is therefore Li's son-in-law. Since its creation in

2013, Allen Yin is believed to have been a member of ZL Investment.

  13. Between 2012 and 2015, Allen Yin was deeply involved in Li's business affairs

and was the general manager of CIU. Starting in 2012, Allen regularly communicated with FW,

both its CEO and employees, regarding assembly and shipping issues associated with CIU's

manufacture of goods for FW. Some of the issues Allen Yin routinely discussed include the

placement of shipping labels bearing FW's trademarked name on every product, the placement

of decals bearing FW's name on all products, purchase orders from FW, FW's directions for the

proper assembly of its products, and the shipping and delivery of products assembled by CIU,

using specific directions from emails sent to CIU by FW's engineers and employees. Allen is

believed to have managed CIU until he was replaced as its manager sometime in 2015 or 2016.

## JURISDICTION AND VENUE

  14. The Court has exclusive jurisdiction of this proceeding pursuant to 28 U.S.C. §

1334(a) and (e)(1).  The Court also has jurisdiction of this proceeding pursuant to 28 U.S.C. §

1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H) and (O).

  15. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

# FACTUAL BACKGROUND OF CLAIMS

## FW's Establishment of Its Operations Since 2012

16.     FW's owner, founder, and CEO, Daniel Banjo, is a mechanical engineer with multiple engineering degrees from among others, Purdue University, Michigan Technological University, Stanford, and the Massachusetts Institute of Technology (M.I.T.).  In early 2012, Banjo established FW after previously working as the head of engineering for SpeeCo, an engineering company in Golden, Colorado. When Banjo worked for SpeeCo, CIU was a SpeeCo supplier.  At that time, CIU had no other customers in the USA.

17.     As SpeeCo's lead engineer, Banjo frequently traveled to China to interact with CIU and to carry out various assignments and projects on SpeeCo's behalf.  While engaged in those efforts, Banjo met and became close acquaintances with Li and his business circle, i.e., Allen Yin, Serena Li and Frank Li.  Li and his inner circle also traveled to Colorado to observe SpeeCo's business practices, because at that time CIU did not produce a whole good or a complete product. It was merely a producer of parts.

18.     Because Banjo worked primarily in the final assembly and manufacture of products for SpeeCo, his work caused him to work closely with Li and his family members.

19.     Banjo left SpeeCo in early 2012 after Blount International ("Blount") purchased SpeeCo.  Blount's purchase of SpeeCo created issues for Li and his inner business circle, as Blount could order its supplies from a different company.

20.     After its creation and registration with the Colorado Secretary of State on May 14, 2012, FW began creating, using and registering multiple trademarks bearing its name, as well as other names that it started using in interstate commerce.

21.     FW began using the trademark "FRICTIONLESS WORLD" in interstate

commerce on May 1, 2012, and it federally registered that mark with the USPTO on November 8, 2016. *See* <u>Exhibit 6</u>.

22.  Since 2012, FW has obtained and registered over two dozen trademarks, including "FRICTIONLESS WORLD", "DIRTY HAND TOOLS", "TROPHY STRIKE", "VINSETTA TOOLS" and "RANCHEX." *See* <u>Exhibits 6, 7</u>.  Its trademark applications are public and identify FW as the owner of each application. Those trademarks are placed on decals attached to FW products, on hang tags attached to the same, and on the owners' manuals that accompany all products.

23.  In addition to trademark registrations, since 2012 FW has also filed and obtained at least fifteen patents. *See* <u>Exhibit 4</u>.  FW also has at least eight pending patent applications. *Id*. FW's patents and patent applications began being published in 2013 when the first of these applications was published.  The earliest patent (D681,701) was issued on May 7, 2013, and the earliest patent application (2014/0124097) was published on May 8, 2014.  *See* <u>Exhibits 8, 9</u>.

24.  FW operates multiple websites, each of which promote FW as the sole source of the products it sells.  *See* <u>Exhibits 10, 11</u>.  Its websites list all the brands of products FW owns and sells, including Dirty Hand Tools, Redback, Vinsetta Tools, Trophy Strike, and RanchEx. *Id*.

***FW Began Transacting Business with The Li Defendants in 2012***

25.  In 2012 FW entered a lease for an office space and warehouse that spanned no less than 18,335 square feet, in Louisville, Colorado.  FW used that office space for all of its business purposes, including the manufacture, distribution, and sale of "Dirty Hand Tools" and "Ranchex" products.  As business grew, FW in 2014 entered a new lease for a 151,000 square foot facility in Westminster, Colorado.  These leases were signed by FW and all payments were made solely by FW.

26.     Shortly after FW was created, Banjo visited China and interacted with Li and members of his inner business circle.  Li and his business circle expressed significant concern about CIU's long term future given the new ownership of SpeeCo, as well as disappointment that Banjo had left Blount/SpeeCo.  Banjo advised them about "Frictionless World LLC" and explained that it would be selling outdoor power equipment to retailers.  *See, e.g.*, Exhibit 1, Schedule B at pp. 11-13 (naming FW and detailing its relationship to other entities); *see also* Exhibit 12 (email from Allen Yin to FW, Jan. 21, 2013 (inquiring about FW's structural details on Li's behalf)).

27.     On FW's behalf, Banjo conferred with the Li Parties regarding CIU assembling products under FW's direction.  Banjo and Li agreed that CIU would assemble products pursuant to FW's directions, using FW's patented drawings as guidelines and inserting or attaching hang tags, decals and instruction manuals bearing FW trademarks and created by FW. *See, e.g.*, Exhibits 13, 14 (showing history of correspondence related to use of FW documentation and technology).

28.     Crucially, CIU had never previously done this type of assembly.  All direction came from FW.  Thus, the parties considered it a remarkable step in their relationship when in November 2012, CIU began assembling products for FW using FW's drawings, labeling, and instructions from FW's engineers. *See*, *e.g.* Exhibit 15 (email from FW to LiShan/Allen of at CIU to FW, Nov. 7, 2012 (regarding orders)); Exhibit 16 (email chain between FW, Allen for CIU, and vendors, Dec. 10, 2012, (discussing parts and production)).  Contemporaneous with shipping products to FW, CIU began invoicing FW for the products it shipped. *See* Exhibit 17; *see also* Exhibit 18.

29.     At the same time FW and CIU's product and supply relationship officially

began, FW successfully began marketing its products to major retailers in the US and worldwide, including Lowes, Home Depot, Menards, Mid-States, and TSC.  *See* Exhibit 20 (FW email to Allen of CIU, Mar. 1, 2013 (providing update on FW sales efforts)).

30.     FW's marketing efforts with large retailers achieved rapid success because of FW CEO Banjo's recognized engineering expertise, his rapid development of new, cutting-edge, patented FW product designs, and his connections developed over years throughout the relevant industry.

31.     CIU relied on FW drawings and the regular instructions from FW's engineers to assemble products for FW.  FW's engineers provided detailed instructions to CIU regarding: (a) the assembly, packaging, labeling and shipping of FW's products; (b) the FW trademark to be used and properly placed; (c) FW's identifying decals to be used; (d) handbooks from FW to be included in the shipping boxes.  *See*, *e.g.*, Exhibit 21.

32.     CIU invoiced FW at its US address for its product assembly services. *See e.g.*, Exhibits 17, 18.

33.     As CIU became the primary product assembly provider for FW between 2012-2013, FW and CIU employees communicated directly on an almost a daily basis regarding the assembly and shipment of the significant and increasing numbers of products that FW designed, patented, and sold to the increasing number of major US retailers to whom FW sold.

### FW, Banjo, Li and CIU Engage in Discussions and Negotiations Regarding Joint Investment Venture

34.     While the business alliance between FW and CIU continued in the latter stages of 2012, Banjo, on FW's behalf, and Li on CIU's behalf, began discussing a joint investment venture.  *See*, *e.g.*, Exhibits 22, 23 (early 2012 project proposals for Li-Banjo investment); Exhibits 24, 25 (email chain between Allen of CIU to FW, Dec. 16, 2012 (discussing proposed

venture); <u>Exhibit 26</u> (email from Allen Li of CIU to FW, Jan. 7, 2013 (regarding Frictionless LLC investment agreement)).

35.     The reasons for the new and proposed joint venture were multiple.  While CIU assembled FW's products in 2012 and 2013, Li witnessed, on a first-hand basis, FW's marketing acumen with American retail giants such as Lowes and Home Depot.  Li became interested in a joint investment venture that would result in an increase in the number of products that CIU assembled and supplied for FW.  Li also desired CIU to obtain an agreement that protected CIU against incurring any liability risks, specifically employee claims, product liability lawsuits and intellectual property infringement lawsuits – all of which were potential pitfalls to selling products in the US market.  Finally, Li was interested in exploring a legal vehicle through which his family members could obtain US green cards or long-term business or resident visas, through membership interests or employment in an American LLC.

36.     Banjo explained to Li that in order to rapidly build FW's business and obtain major clients, the parties would need to make a joint initial investment of capital to manufacture and stock a variety of products in an increased inventory, so that FW could effectively compete against its large competitors.  Under the plans discussed, CIU would transfer the product to a pass-through company until sales occurred, at which time that company would transfer the product to FW and the product would ship to the retailer.  This plan would permit for a large inventory to exist in the US, thereby allowing immediate delivery to retailers and a large offering of products, without requiring FW to make large cash outlays for standing inventory prior to selling product.

37.     This third-party pass through arrangement was further intended to shield Li, CIU and the other Li Defendants from any potential personal or business liability arising from their sale of products to FW and from the sale of products by FW to retailers.  *See, e.g.,* <u>Exhibit 27</u>

(email from Allen Yin of CIU to FW, Mar. 26, 2013 (identifying Li's creation of separate company to conduct the purchases from CIU and himself to remain silent partner)). FW would undertake all the risks associated with being a US employer and wholesale retailer, including the risk of product liability and intellectual property lawsuits, while sharing revenues from the same with CIU through the pass-through company.

38.     In September 2012, Banjo provided Li with three initial variations of a proposal for this pass-through company proposal. The company would be majority-owned by Li and called "LiBanjo." The proposals set forth several alternative concepts for the "LiBanjo" pass-through company, pursuant to which a separate front-facing company would manage all designs, patents, sales, marketing and insurance, and pass revenues after expenses back through "LiBanjo." *See, e.g.*, Exhibits 25, 28, 29. All of the three presentations Banjo presented to Li envisioned using such a front-facing company: two of the presentations named FW as that company, the third outline used the words "shell company." *See id.* None of the presentations suggested operating "LiBanjo" as the front-facing company. *See id*.

39.     The most complete presentation that Banjo gave Li is a presentation dated September 20, 2012. That presentation contains a cover page, describes marketing and initial product offering strategies, and requests feedback from Li on the same. *See* Exhibit 25. Sections of each of the "LiBanjo" proposals again appear in Schedule B to the FOA. *Compare* Exhibit 25 *with* Exhibit 1, Schedule B. Those sections identify FW as the front-facing company that would sell the products from the expanded joint venture, retain a small percentage (5%-10%) of the sales price, and pass on certain costs to the pass-through company, Frictionless LLC. This multi-tiered operating concept, with CIU in the center protected by two other companies, was detailed and made explicit in the FOA that the parties executed on April 11, 2013. Page 12 of Schedule B

provides a diagram of the same.  *See*, <u>Exhibit 1</u>, Schedule B at p. 12.[1]



40.    The name "LiBanjo" was eventually rejected as the suggested name for the pass-through company because it contained Li's name.  Instead, the parties went with "Frictionless LLC," which was favored because it was a direct derivative of FW's recognized trademarked name – "Frictionless World".

41.    The idea of Frictionless LLC as the pass-through company, and FW as the front-facing company responsible for all potential liabilities associated with the joint venture, was appealing to Li for reasons other than just the avoidance of liability. First, as a newly created LLC with no intellectual property and no track record with retailers, Frictionless LLC would find it extremely difficult to obtain retail sales contracts in the US with large retailers who already had

---

[1] As part of their ongoing discussions for the expanded joint venture, Banjo and Li even discussed the concept of an EB-5 visa. The EB-5 visa program provides a method for obtaining a green card for foreign nationals who invest in a company in the US. *See, e.g.,* <u>Exhibits 24</u> (email chain between Allen Yin and Dan Banjo, Dec. 27, 2012 (discussing EB-5 status) and <u>Exhibits 28, 29</u>. Banjo and Li initially explored having Li invest the required one million dollars in the new pass-through company. Li rejected the idea of the EB-5 visa program because it would require his name to be extensively associated with the paperwork required for such an immigration process. *See id.* He was determined to remain a silent party to the expanded joint venture, hence the need for a pass-through company.  *See* <u>Exhibit 24</u> (email from Allen Yin to Dan Banjo, Jan. 7, 2013) and <u>Exhibit 31</u> (email from Allen Yin to Dan Banjo, Mar. 27, 2013 (identifying name to be used for ownership)).

created a relationship with FW.  Second, as a 90% foreign-owned company, Frictionless LLC would have encountered significant difficulty obtaining liability insurance from US insurers, and such insurance is a requirement for obtaining contracts to sell with US retailers.  This issue would have been aggravated by the fact that ZL Investments, the entity Li created to own his equity in Frictionless LLC, is a Chinese shell company with no known business record.

42.     Finally, FW had already been in business since May 2012 and had signed property leases, obtained US lines of credit, and had hired (and continued to hire) top-notch technicians and sales employees – all of which created obligations and risks.  Given these multiple issues, Li pushed for FW to be the front-facing company, with Frictionless LLC acting only as a pass-through company.  In essence, Frictionless LLC would receive the revenue, but take no risk.

43.     As the parties worked to finalize the FOA for Frictionless LLC, and Li learned more about the legal risks involved in US investments, he not only desired for FW to be the front-facing company, he also decided that his portion of Frictionless LLC would be owned neither by him nor CIU, but rather by a completely new Chinese pass-through company, ZL Investment, as an "investment company".  *See* Exhibit 31.

44.     During the parties' negotiations and discussions, Banjo frequently communicated with Allen Yin and members of the Li Defendants over the new joint venture.  Several weeks before the deal was finalized Allen informed Banjo about "ZL Investment" and stated that it would consist of "Frank, Selina, Tracy [Li's daughter, married to Allen] and [Allen]" as its members.  *Id.*

45.     Allen emphasized that Li wanted to keep Li and CIU as silent partners on the joint venture, and reiterated that the expanded venture between FW and CIU should operate to "keep sale products to customer but *never mention CIU's name*." Exhibit 32 (email Allen Yin to FW,

Dec. 16, 2012, 7:29 PM).

46.     While the discussions for the expanded joint venture were ongoing, FW and CIU carried on business as usual.    CIU regularly fulfilled FW's orders and its employees communicated with FW's on a range of crucial matters via phone, email and in-person communications over the assembly and shipping of FW's products.  CIU assembled products for FW starting in November 2012, and began invoicing FW for products shipped in February 2013, months before Frictionless LLC's creation.  *See* Exhibit 17.  CIU continued invoicing FW directly for over a year after Frictionless' creation.  *See* Exhibit 18.  All emails to CIU from FW from 2012 through 2019 were sent and received through email addresses with the @frictionlessworld.com affixation.

### *The Parties Execute the Frictionless LLC FOA*

47.     Banjo, on FW's behalf, met with Li and members of his business circle in China on April 8, 2013 to review the FOA and Exhibits to the same.

48.     In the days leading up to that meeting, Banjo as Manager for Frictionless LLC prepared the Operating Plan per the negotiations of the Parties and the proposed terms of the FOA.  *See* Exhibit 1 at ¶5.4.

49.     Pursuant to the FOA, ¶5.4, "The Manager is responsible for implementing the Annual Operating Plan".  *Id*.

50.     Pursuant to the FOA, ¶6.5, "At the Members annual meeting, the Members and Li shall review the Operating Plan, prepared by the Manager."  *Id*.

51.     Pursuant to the FOA, ¶6.5, "The Annual Operating Plan for 2013 is attached hereto as Schedule B".  *Id*.

52.     Li and the members of ZL Investment reviewed the FOA for Frictionless LLC in its totality, including the attached Schedule B as per the FOA. *Id*., ¶ 6.5.

53.     On April 11, 2019 the parties executed the FOA.   *See* <u>Exhibit 1</u> (executed agreement).

54.     The FOA executed by the parties accommodates the structure of FW as the front-facing entity. It states that the company's purpose includes **"*the manufacture and distribution of tools and power equipment*"** and that said business can be conducted "***indirectly through another company, joint venture, or other arrangement***" (***emphasis added***). *Id*. at ¶2.5.

55.     Pursuant to the FOA, Schedule B, CIU manufactures products in response to purchase orders issued by FW through the pass-through company Frictionless, LLC.  *See* <u>Exhibit 1</u> at Schedule B, p. 11-13. CIU then sells the products to Frictionless, LLC which then sells them to FW.  *Id*.  FW acts as the front-facing company dealing with retail and consumer customers worldwide, product marketing, US credit and banking relationships, leases, employees, liability and employee insurance, legal issues, and retaining and obtaining all business.  *Id*.  FW, to expand its client base and grow the business, retains 5-10 percent of revenue and charges a five percent fee on expense costs.  *Id*.  All remaining revenues are passed back through Frictionless LLC to CIU.  *Id*.

56.     Pursuant to the FOA, FW retained all ownership over FW intellectual property.  *Id*.  FW provided a perpetual, limited non-exclusive patent license to CIU for the purpose of manufacturing products per its direction for Frictionless, for delivery to FW or its retailers.

57.     The FOA contains a non-competition covenant. Under that covenant, each member of Frictionless LLC and Li agreed that he or she:

> "shall cause his, her, **or its Affiliates**, to not compete with the Company, directly, or indirectly, in a business substantially similar to the business of the Company of its subsidiaries anywhere where the Company does business, **or the distribution of any products distributed by the Company** or any of its subsidiaries anywhere in the World."

(***Emphasis added***).  Exhibit 1 at ¶4.4. Under this definition, "Affiliates" would include CIU or any

other company owned by Li, preventing them from competing with Frictionless LLC.

58.     The non-competition covenant further states that direct and indirect competition

under its auspices shall include but is not limited to:

> "having any business or employment relationship with any past or present
> client, supplier, or employee of the Company, and any competition as a sole
> proprietor, partner, corporate officer, director, shareholder, member,
> manager, employee, agent, independent contractor, trustee, or in any other
> manner in which such Member or Li, ***or its or his Affiliates***, holds any
> beneficial interest in a competitive business, derives any income from such
> business, ***or provides any service, including the benefit of his, her or its
> reputation or knowhow, to such business***. For purposes of clarification, the
> sale of parts and products that are materially different from parts and
> products that the Company sells or intends to sell shall not be considered to
> be competing with the Company."

(***Emphasis added***).  *Id*.  Based on these provisions, direct sales to competitors of Frictionless LLC

and FW by Li and his affiliates – that is the Li Defendants – constitute a direct breach of this

clause, and are a severe detriment to Frictionless LLC and to FW.

59.     Under the FOA, Frictionless LLC's members unambiguously agreed to indemnify

and hold harmless each other and their successor's and assigns:

> "from and against ***any and all claims … of every kind and nature*** arising
> out of, resulting from, or in connection with ***any breach*** of a representation
> and warranty or covenant set forth in this ARTICLE 4."

(***Emphasis added***).  *Id*. at ¶4.6.  The FOA provides broad limitations of liability for the Manager

in the execution of his duties to the company.  Under the agreement, Banjo as the Manager could

not be liable to Frictionless LLC, or to any other member of the company, for actions or failures

to act, or errors of judgment, or for any act or omission "believed in good faith to be within the

scope of authority conferred by this Agreement."  *Id*. at ¶5.9.1.  The FOA also insulates Banjo

from personal liability in the event Frictionless LLC as a company is adjudged liable "under any

judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company,

whether that liability or obligation arises in contract, tort, or otherwise….” *Id*. at ¶5.9.3.

60.     Finally, the FOA states that Frictionless LLC will indemnify and hold Banjo, <u>his</u>

<u>affiliates</u>, and any officer or employee harmless:

> “from and against any loss, liability, judgment, damages, amounts paid in settlement or expense, including without limitation, reasonable attorneys’ and accountants’ fees and disbursements, arising from or in connection with any threatened or actual claim, action, suit or proceeding and any appeal therein, including any brought by or in the right of the Company, if the Manager, or any such Affiliate, Officer, or employee acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and provided that his or her conduct is not adjudged to have constituted gross negligence, willful misconduct, or an intentional breach of his, her, or its fiduciary obligations in the performance of his, her, or its duties to the Company.”

<u>Exhibit 1</u> at ¶5.9.4.

61.     FW, as a company wholly owned and operated by Banjo through which the

operations of Frictionless LLC were conducted from April 11, 2013 through April 29, 2019

pursuant to the terms of the FOA, comprised an affiliate of Frictionless LLC.

### *Schedule B of The FOA Explicitly Identifies FW’s Role in the Expanded Joint Venture*

62.     The FOA, Schedule B sets forth the basic operating terms that the parties then

operated under for the next six years. Those terms include conditions detailing the parties’

obligations under the proposed joint venture as follows:

- FW would remain the forward-facing company to customers. In doing so, it would continue to be the named entity for all business-related matters, including leases, employees, insurance, and all sales and marketing.

- CIU would be the first manufacturer of choice for all of FW’s products. Only if CIU could not manufacture a product would FW be allowed to have the same product manufactured elsewhere. The goal was to both provide additional business to CIU and broaden the product base being offered to retailers.

- FW would remain an independent company but would also be utilized as a means to significantly increase CIU's product base and US product sales. That would happen by increasing the number of products assembled on FW's behalf by CIU and increasing the number of retailers selling FW products assembled by CIU.

- FW would issue purchase orders to CIU through Frictionless, and CIU would assemble and ship those products directly to FW or to FW's contracted retailers, as directed.

- FW would license CIU the right to use patents developed by FW for the purpose of assembling and shipping products developed and patented by FW to FW, so long as Banjo remains a member of Frictionless.

- That license of intellectual property did not include trademarks or other intellectual property developed by and/or registered to FW. No such licenses have ever been issued to CIU.

- When FW sold products pursuant to the joint venture, FW would: (a) retain and use 5-10% of the revenue realized from those sales to help grow the parties' collective business; and (b) retain and use a 5% markup on some overhead costs for purposes of expanding FW's and CIU's marketplace reach.

- FW would remit all monies left over after the deduction of its overhead costs, labor, and expenses ("Operating Costs") and the aforementioned percentages to Frictionless LLC, which would in turn remit payments to CIU for products assembled by CIU and sold by FW.

- Where FW sold products strictly assembled by FW and/or not assembled by CIU, FW would keep 100% of the revenues associated with any such product.

Exhibit 1 at Schedule B, pp. 11-14.

### *FW and CIU Conduct Business in Accordance with Schedule B of the FOA*

63.     After the execution of the FOA, FW moved forward in reliance on the contractual representations made by ZL Investment and Li.  FW continued handling all property leases, loans, liability insurance, handling all employees, managing all advertising and client relations, and entering into all third- party business agreements.  All communications from the Li Defendants

continued to be conducted via the _@frictionlessworld.com domain, and all products assembled by CIU for FW continued to be assembled using FW patent designs and bearing FW's company decals and hang tags.  *See*, *e.g.*, Exhibit 21.  Frictionless LLC never obtained any lease, liability insurance, hired any employees, created or owned an email address, obtained any phone number, or obtained any domain and website.  It existed solely as a pass-through LLC between FW and CIU.

64.     Per the terms of the FOA and Section 2.5 of the FOA's Schedule B, CIU continued conducting business directly with FW on a nearly daily basis.  CIU continued to invoice FW for products shipped from CIU to FW.  *See, e.g.,* Exhibit 18.  From 2013 to April 2019, CIU delivered tens of millions worth of products to FW for FW's distribution and sales.  The parties exchanged thousands of emails pertaining to their business operations.  This pattern and practice continued consistently for over seven years, with both sides fully aware of their nature and course of performance, and importantly without any objection ever raised to the course of conduct between them or by any of the Li Defendants.

65.     The expanded joint venture required constant contact between FW and CIU, as prior to doing business with FW, CIU did not manufacture whole products. It had previously had no assembly lines.  It had never before assembled outdoor power equipment products, including the log splitters or tillers it was assembling under FW's guidance and direction.  It had solely been a parts supplier.  Subsequent to November 1, 2012, CIU became able to assemble and produce products as well as specialized parts for FW, all of which were patented by FW, through the diligent efforts and expertise of FW's designers and engineers.  Based on these efforts, FW arranged for approximately 90% of its production to be performed by CIU.  FW employees contacted, visited, and consulted CIU multiple times a year between 2012 and early 2019.

66.     Relying on this seven-year course of conduct, FW, through Frictionless LLC, continued placing purchase orders with CIU in 2018 and 2019.  Those products were to be assembled in accordance with FW's patented designs, labeled with FW's trademarks, and delivered either to FW or directly to the retailers with which FW contracted.  *See, e.g.,* Exhibit 33 (email summary of order statuses).

67.     Pursuant to the FOA, FW absorbed all risks associated with the joint venture. Reflecting these realities, FW has unilaterally litigated several business-related disputes which would otherwise have implicated Frictionless LLC and Li, including two matters involving claims of patent infringement against third parties. FW alone resolved each dispute.

68.     The arrangement described in the FOA and in Schedule B is a true and correct reflection of how FW, CIU and Frictionless LLC performed pursuant to the joint venture for seven years.  FW ordered products from CIU through Frictionless.  CIU manufactured the products and delivered the same directly to FW or its contracted retailers, consistent with Exhibit 1, Schedule B at pp. 11-13.  Products transferred from Frictionless to FW at the time of sale.  The business goal was always to increase the number of products being manufactured by CIU and sold by FW. FW at all times acted as the forward-facing company. *Id.*

69.     Following the mandate in Schedule B, Li appointed a CFO for Frictionless by appointing Serena Li, his daughter-in-law.  *Id*. at p. 11.

### Defendants Act in Repeated Breach of the FOA, Intentionally Defraud FW and Halt Product Delivery to FW, Causing Irreconcilable Injury to the Same

70.     At all times since the April 2013 signing of the FOA, FW, and Banjo operated in good faith to increase sales and jointly achieve the parties' goals. Unbeknownst to FW and Banjo, however, from  2014  through  2018 the Li Defendants were significantly overcharging Frictionless LLC for the cost of assembling the products CIU delivered to FW. After discovering

this issue, FW confronted Li and members of his inner circle in a meeting in January 2019. Li conceded CIU had been overcharging Frictionless LLC for certain products assembled for delivery to FW under the joint venture agreement and corrected CIU's pricing in early 2019. CIU's overcharging from 2014 – 2018 cost FW <u>over seven million dollars</u> in lost profits. *See* <u>Exhibit 34</u>.

71.    In addition, Li contractually agreed pursuant to the FOA, Section 4.4, and the attached Operating Plan, that his affiliate CIU would <u>immediately</u> cease selling products to competitors of Frictionless LLC and its operating affiliate FW. *See* <u>Exhibit 1</u>, § 4 and Schedule B at p. 11.  Contrary to the same, between April 12, 2012 and the present, the Li Defendants sent nearly 400 separate shipments of CIU products to direct competitors of Frictionless LLC and FW. *See* <u>Exhibit 35</u>. Those competitors include Blount and Tooltuff LLC, to which Li and CIU expressly represented they would cease such sales. *See* <u>Exhibit 36</u> (email chain between Allen Yin of CIU to FW, Sep. 29, 2013).  Upon information and belief, these shipments alone total *over $50 million dollars* in goods, and constitute a direct violation of the FOA. Upon information and belief, CIU <u>never</u> ceased shipping products to companies directly competing with Frictionless LLC and FW.

### *Banjo Modified the FOA in Reliance on False Representations from the Li Defendants*

72.    Serena Li, acting on the behalf of Li and CIU, repeatedly represented to FW in late 2018 and early 2019 that CIU was running low on operating funds and needed to receive additional payments from Frictionless LLC.[2]  *See* <u>Exhibits 37-39</u>.  In response to Serena and

---

[2] No evidence supporting said representations has been produced to date.

Frank Li's representations, Banjo agreed on behalf of FW to obtain a company loan and make accelerated payments in order to assist CIU in fulfilling its shipment obligations to FW. *See, e.g.,* Exhibit 40 (email chain between Frank Li and FW, Feb. 20, 2019).

73.     Towards that end, and in reliance upon Serena Li's representations regarding CIU's cash needs, FW agreed to the assignment of all Frictionless LLC inventory to FW (totaling $6,611,227.00) and a long-term loan from FW back to Frictionless for that amount, followed by the use of that assigned inventory as collateral to obtain a bank loan for an additional $1.5 million paid directly to Frictionless and then to CIU.  FW further agreed to the acceleration of FW's payments to Frictionless prior to their due dates.  All of those funds were immediately passed on to CIU.

74.     FW took these actions in early 2019 based on the understanding that CIU was going to ship products as ordered by FW through Frictionless LLC.  During this period FW was repeatedly being assured by CIU that products were being assembled and shipped. *See e.g.,* Exhibits 41-43; *see also* Exhibit 33.

75.     FW also believed that the products it was agreeing to accept were of suitable quality consistent with CIU's historic production.  FW soon learned, however, that beginning in late 2018, CIU started shipping substantially substandard products, thereby causing a marked increase in FW's warranty obligations to retailers.  FW is informed and believes that CIU knew of the quality issues and either intentionally or negligently concealed those issues from FW.  After FW discovered the quality issues, inventory was either sold at substantially reduced prices or could not be sold at all.

76.     On February 1, 2019 Banjo signed a long-term Loan Agreement on the behalf of FW for the purchase of all Frictionless LLC inventory. *See* Exhibits 44-46. FW then borrowed

$1.5 million dollars from Chase Bank and paid the entire amount to Frictionless, for payment to CIU.  The Frictionless LLC inventory was not used as collateral for this loan or to induce Chase Bank to make the loan.  In addition to the Chase Bank loan, FW began making accelerated payments to Frictionless LLC starting in January 2019.  Between January 1, 2019 and the time that ZL Investments' arbitration action was filed in April 2019, FW had paid Frictionless LLC an astonishing $4,460,265.84.

77.    Heading into March – April 2019, FW repeatedly asked Frank Li for confirmation of outstanding shipping orders.  Frank Li or his employees at CIU repeatedly and fraudulently responded that CIU was about to ship, stating falsely in March and April that shipping was occurring. *See* <u>Exhibit 47</u> (April 2, 2019 email from Frank Li to FW saying shipping was occurring "this week."); <u>Exhibit 48</u> (March 6, 2019 email from Janice Jia at CIU to FW, copying Frank Li, saying "CIU is producing them in a hurry now, CIU really does not want to delay the delivery for these POs").

78.    The facts show that while Serena and Frank Li, on behalf of Li and CIU, urged FW to take on millions of dollars in additional liability and repeatedly promised to ship products, they were simultaneously conspiring to halt all shipments to FW and Frictionless LLC under the joint venture with the foreseeable goal of causing irreconcilable injury to FW.

79.    On April 15, 2019, the Li Defendants, through ZL Investments, filed a factually and legally unsupported arbitration demand against FW and its CEO, Daniel Banjo.  FW was not a party to an arbitration agreement with the Li Defendants. The claims asserted in the arbitration were based on the incredible contention, contrary to the 7 year history of transactions detailed above, that the Li Defendants did not learn of the existence of FW until late 2018 and believed at all times that its business was being solely conducted through Frictionless LLC, the pass-through

entity jointly created by FW, Banjo, CIU and Li that had no physical location of its own, no
website, no email address, no telephone and no employees other than Serena Li.

80.     Upon receiving the arbitration demand, FW and Banjo, through counsel,
immediately asked CIU and counsel for ZL Investments whether shipments would be provided,
per contract and as had been repeatedly represented.  The next day, on April 16, 2019, the Li
Defendants, **via counsel,** assured counsel for FW that regardless of the arbitration, CIU would
continue to fulfill the purchase orders. *See* Exhibit 49.

81.     On April 29, 2019, after making misleading promises for over six months, Frank
Li reversed his representations and advised FW that CIU was ceasing shipments.  In response to
a text from FW asking whether or not CIU would again start shipping, he stated it "depends on
your attitude." Exhibit 50.  Other than the vindictive text message, Frank Li made no mention of
any issue causing CIU not to ship, nor did he mention any of the alleged logistical issues CIU had
offered previously as a reason for delays.  This abrupt reversal of the representations made for
months took place at the beginning of the 2019 summer sales season, just as retail stores were
being stocked with goods, and well after third-party contracts for the delivery of millions of
dollars in goods had been executed by FW with multiple third-party retailers.

82.     By these acts, the Li Defendants overtly breached a total of $20,814,091 in purchase
orders issued by FW through Frictionless LLC for delivery to FW or to FW's contracted retailers.
*See* Exhibit 51 (aggregate amount of existing and unfulfilled purchase orders as of April 29,
2019).

83.     The breaches were knowingly committed to undermine FW's relationships with its
multiple major retailers, and to leave FW – a Colorado employer of almost 80 people – unable to
operate in 2019.

84.     By leaving FW and by extension Frictionless LLC with no products to sell in the 2019 season, the Li Defendants' actions caused irreconcilable harm to FW, as well as to Frictionless LLC.  As a direct result of the Li Defendants' breaches of contract, multiple retailers who had contracted with FW for years have been forced to abandon FW.  *See, e.g.,* Exhibits 52-55.  The retailers, among them Lowes, Costco, Menards, Mid-States, and Fleet Farm, have been forced to switch to alternative suppliers due to FW's ongoing failure to deliver.  *Id.*

85.     These same retailers also began penalizing FW for its contractual failure.  *See, e.g.*, Exhibit 56 (almost $397,000 dollars of charges assessed by Mid-States against FW for unfulfilled orders).  Moreover, these retailers will not contract with FW again at any time in the foreseeable future.  CIU's actions caused irreconcilable harm to FW's reputation and earnings ability.

86.     On May 3, 2019, due to the actions of Li and his associates, Banjo became unable to manage Frictionless LLC and resigned his position as Manager of Frictionless LLC.  *See* Exhibit 5 (email chain between counsel).

87.     As stated, CIU has breached a total of $20,814,091 in purchase orders to FW and Frictionless LLC.  *See* Exhibit 51.  FW has been unable to find alternative sources for that production, primarily because CIU intentionally mislead FW for months regarding its alleged intentions to ship the products, only to disclose its intention not to ship and breach the purchase orders on April 29, 2019, well into the sales season.

88.     Subsequent to the breach, CIU for the first time alleged its reason for breach was financial constraints.  CIU has never produced evidence to support this assertion.  To the contrary, the evidence demonstrates Serena and Frank Li, from December 2018 through April 29, 2019, repeatedly promised on behalf of CIU to ship FW's product while making false statements regarding delays and other false excuses.  *E.g.*, Exhibits 41-43, 47-48.  The evidence also

demonstrates that, during the same time period, CIU pressed for accelerated payments from FW – allegedly to assist in faster assembly and shipment. *See id.*; *see also* Exhibit 37-39. In reliance on the same, FW borrowed and paid a total of $4,460,265.84 to CIU between January and April 2019. FW further agreed to modify Schedule B of the FOA to release Frictionless LLC from any obligation to pay FW operating expenses. *See* Exhibits 44-46. FW took these multiple costly actions **in direct reliance on the fraudulent representations made by both the Li Defendants and Li's counsel that CIU would continue to fulfill its purchase orders**. The evidence now shows that the Li Defendants at no time had any intent to ship. They were at all times acting with fraudulent intent to cause severe and irreconcilable harm to FW, as well as to Frictionless LLC.

89.     Confirming the false nature of CIU's post-breach explanation for its failure to ship, the Li Defendants refused FW's offer to make immediate on-delivery payment to CIU for every shipment made.[3] This stop-gap solution would have ensured that FW would be able to meet its obligations to its retailers and customers, thereby mitigating monetary damages to FW. The Li Defendants rejected the offer and still refused to ship, in direct breach of contract and further evidencing their bad faith, fraudulent intent to cause harm to FW.

90.     CIU's breach of over 250 purchase orders and failure to ship products to FW triggered a cascade of losses for FW: (a) a staggering reduction of revenue due to inability to deliver/sell products; (b) it caused what was expected to be FW's most profitable year to instead reflect extreme losses, resulting in the filing of bankruptcy; (c) it caused a reduction of the FW workforce by over 90%, and growing; (d) it forced the process of abandoning FW's 151,000 square feet warehouse in Westminster, Colorado; (e) it caused FW's loss of long-standing

---

[3] Pursuant to the agreement between Frictionless and

contracts with mammoth retailers such as Lowes, Home Depot, Costco, Menards and others, which in turn resulted in the removal of FW products from hundreds of stores both inside and outside of the US; and (f) it caused an over 90% loss in the value of FW as a business, which immediately prior to breach was valued at over $50 million. All of the above-stated damages increase daily.

91.     Because of its sharp drop in income and daily operating losses, FW filed a chapter 11 bankruptcy petition on September 30, 2019.  That filing occurred as a direct result of the intentional and ongoing actions of the Li Defendants.

92.     Finally, the actions of the Li Defendants reflect an overt effort to halt the business of Frictionless LLC, to the detriment of FW, as they ceased to deliver to Frictionless.  That action constitutes a breach of the FOA.  The FOA requires that "[d]uring the period before and during any arbitration... the Parties shall continue to fulfill their duties under this Agreement."  Exhibit 1 at ¶14.6.8.  By breaching the purchase orders and failing to ship immediately after filing this action, the Li Defendants intentionally acted in direct breach of the FOA.

### The Li Defendants' Actions Comprise Unlicensed and Infringing Use and Possession of FW Intellectual Property

93.     Pursuant to the FOA, CIU was provided a limited license by FW to use FW patents for the purpose of assembling products for the pass-through company Frictionless, "to be sold through F to FW".  Exhibit 1, Schedule B, p.11.  All products manufactured by CIU between 2012 and 2019 for Frictionless LLC were done so at the direction of FW, in reliance on FW's patented designs, with the support of FW engineers and pursuant to the limited patent license provided to CIU under the FOA. *Id.*, *see, e.g.*, Exhibit 21.

94.     Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW and in reliance on FW patents.

95.   CIU failed to deliver said products to FW (in breach of over 250 purchase orders).

96.   On reasonable information and belief, CIU is now using, distributing, selling and manufacturing FW's patented products, or sublicensing the right to use, distribute, sell and manufacture FW's patented products to third-parties, or attempting to use, sell, distribute and/or license or sublicense FW's patented products, without license or permission, to the direct detriment of FW.

97.   CIU has possession of 7 years of protected patent designs provided by FW for its product assembly.

98.    On reasonable information and belief, CIU is using those protected patent designs to manufacture FW's patented products, without license or permission, to the direct detriment of FW.

99.   In addition, CIU has at no time been provided any license to use FW trademarks. FW's trademarked names and designs were prepared by FW and sent in decal, hang tag and user manual format for CIU to place on or insert with the products assembled per the direction of FW, for shipment to FW and FW retailers.

100.   Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW bearing FW registered trademarks in decal and hang tag format and packaged with FW manuals bearing FW trademarks.

101.   CIU failed to deliver said products to FW in breach of over 250 POs issued to CIU.

102.   Upon information and belief, CIU is now using, distributing, selling and/or licensing, or attempting to use, sell, distribute and/or license FW's trademarked products, without license or permission, to the detriment of FW.

***Injury to Frictionless World, LLC***

103.    FW believes that unless enjoined by the Court, the Li Defendants will continue their course of wrongful conduct and, based on 7 years of access and non-stop training from FW, use, sell, distribute, manufacture and infringe upon and/or otherwise profit from FW's patented designs and trademarks.

104.    As a direct and proximate result of the Li Defendants' wrongful acts, FW has already suffered irreconcilable injury and been forced to file the underlying bankruptcy case.

105.    FW has no adequate remedy at law to redress the injuries that Li Defendants have caused, are causing and are likely to continue to cause by their conduct.  FW will continue to suffer irreconcilable injury until the Li Defendants wrongful actions are enjoined by this Court.

**FIRST CLAIM FOR RELIEF**
**TURNOVER OF PROPERTY OF THE ESTATE – 11 U.S.C. § 542(a)**
**(All Defendants)**

106.    FW incorporates by reference the allegations above, as though fully set forth herein.

107.    11 U.S.C. § 542(a) requires an entity in possession of property of the estate that the debtor-in-possession may use, sell or lease to turnover and account for such property, or the value of such property.

108.    One or more of the Li Defendants and/or Frictionless LLC are in possession of the following property of the estate:

A.    Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and control and using FW's patented product designs;

B.    Communications from FW to CIU, CIU employees and/or the Li Defendants containing product assembly instructions, including but not limited to written assembly instructions and/or patented product designs.

C.    Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and

control bearing FW trademarks on the product and/or packaging;

D.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and

control that previously bore FW trademarks, which have been altered to remove the

same;

E.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and

control that have not had FW trademarks attached, as required.

(the "Property").

109.   The Property has significant value and is property that FW may use, sell or lease

pursuant to 11 U.S.C. § 363(b).

110.   Accordingly, Defendants must account for and turnover the Property to FW.

**SECOND CLAIM FOR RELIEF**
**PERMANENT INJUNCTION – 11 U.S.C. § 105(a)**
**(All Defendants)**

111.   FW incorporates by reference the allegations above, as though fully set forth herein.

112.   Defendants' use of FW's intellectual property and competition with FW in violation

of the non-competition covenant in the FOA violate the automatic stay provided for in 11 U.S.C.

§ 362(a), as they are exercising control over property of the estate, as detailed above.

113.   If an injunction does not issue enjoining Defendants from in any way using FW's

intellectual property in their possession and violating the non-competition covenant in the FOA,

FW will, upon reasonable information and belief, suffer irreparable injury through the loss of its

intellectual property and the importation, sale, distribution to retailers and/or licensing of

infringing products in the US.  Moreover, the infringing products remaining in Defendants'

possession may be sold, distributed to retailers and/or licensed for use using one or more of FW's

marks, which have become famous through the sale of tens of millions of dollars' worth of FW

products in major retailers nationwide over the past 7 years.  Such actions would cause severe

consumer confusion and irreconcilable harm to FW that could not rectified via a damages award.

114.   Defendants will suffer no damage to any legal right or interest through the issuance

of such an order because they have no right to the intellectual property at issue.

115.   The injunction sought will not be adverse to the public interest.

## THIRD CLAIM FOR RELIEF
## DECLARATION THAT THE STAY APPLIES TO THE
## ARBITRATION – 11 U.S.C. § 105(a)
### (All Defendants)

116.   FW incorporates by reference the allegations above, as though fully set forth herein.

117.   11 U.S.C. § 362(a) operates as a stay of, among other actions: (1) the

commencement of litigation against the debtor and (2) any act to obtain possession of property of

the estate and exercise control over property of the estate.

118.   Through the arbitration, Defendants seek relief against FW and Banjo.

119.   FW and Banjo are bound by contract in such a way that (a) FW is obligated to fund

the cost of Banjo's legal defense and (b) the liability of Banjo, if any, in the arbitration may be

imputed to FW.

120.   Accordingly, the Court should declare that the stay set forth in 11 U.S.C. § 362

applies to the arbitration to prevent irreparable damage to FW and its bankruptcy estate.

## FOURTH CLAIM FOR RELIEF
## PERMANENT INJUNCTION – 11 U.S.C. § 105(a)
### (All Defendants)

121.   FW incorporates by reference the allegations above, as though fully set forth herein.

122.   Defendants' continued prosecution of the arbitration violates the automatic stay set

forth in 11 U.S.C. § 362.

123.   If an injunction does not issue enjoining Defendants from continuing to prosecute

the arbitration, FW will suffer irreparable injury, including, without limitation, the following: (a) the obligation to fund the defenses of Banjo; (b) the obligation to indemnify Banjo; (c) the potential collateral estoppel effect against FW of any judgment entered against Banjo; and (d) the potential of conflicting rulings arising against Banjo and FW in separate forums.

124.   Defendants will suffer no damage to any legal right or interest since the claims against Banjo can be stayed until after the completion of this proceeding.

125.   The injunction sought will not be adverse to the public interest.

### FIFTH CLAIM FOR RELIEF
### OBJECTION TO CLAIM – 11 U.S.C. § 502
### (Against Frictionless LLC)

126.   FW incorporates by reference the allegations above, as though fully set forth herein.

127.   Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

128.   The disputed claim is comprised of two components: approximately 50% consists of the long-term loan executed on February 1, 2019 and the remaining approximately 50% consists of a 360-day payable purportedly due Frictionless LLC for products sold to FW.

129.   As set forth in the Fourth Claim for Relief below, the long-term loan obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and Frictionless LLC's claim in the bankruptcy case should be reduced by the amount of the avoidable loan.

130.   In addition, Frictionless LLC, by (a) wrongfully breaching purchase orders submitted by FW to CIU through Frictionless in 2019 in excess of $20 million and (b) delivering substandard product resulting in numerous warranty claims, substantially reduced sale prices, and in many instances, unsellable inventory, has caused damages to FW far exceeding the remaining approximately $6 million purportedly due Frictionless LLC.

131.   Accordingly, Frictionless LLC should be deemed to have no claim in the bankruptcy case.

### SIXTH CLAIM FOR RELIEF
### EQUITABLE SUBORDINATION – 11 U.S.C. § 510(c)
### (Against Frictionless LLC)

132.   FW incorporates by reference the allegations above, as though fully set forth herein.

133.   Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

134.   Frictionless LLC is an insider of FW.

135.   The Li Defendants engaged in a fraudulent scheme to convince Banjo, through FW, to execute a long term loan agreement with Frictionless, to borrow $1.5 million from Chase Bank and pay it to Frictionless, and to have FW accelerate payments to Frictionless. All said funds then transferred to CIU.

136.   FW took these actions in reliance on repeated fraudulent representations of the Li Defendants that CIU was assembling and would be shipping products.

137.   The scheme culminated in the commencement of a groundless arbitration proceeding against Banjo premised on the incredible assertions that the Li Defendants had no knowledge until late 2018 of the existence of FW – a company with whom the Li Defendants had conducted business nonstop since 2012.

138.   Despite receiving inflated sums from FW, Frictionless and CIU failed to provide fair value in return.   On April 29, 2019, subsequent to the filing of the arbitration, the Li Defendants advised FW that no shipments would be issued.

139.   As a result of the foregoing fraud and unfair conduct, to the extent Frictionless,

LLC's claim is allowed, the claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

**SEVENTH CLAIM FOR RELIEF**
**FRAUDULENT CONVEYANCE – 11 U.S.C. § 548(a)(1)(B))**
**(Against Frictionless LLC)**

140.    FW incorporates by reference the allegations above, as though fully set forth herein.

141.    Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any obligation incurred by the debtor that was incurred on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the obligation and (i) became insolvent as a result of the obligation, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

142.    The long-term loan in the amount of $6,611,227.00 from FW back to Frictionless LLC (the "Obligation") was an obligation of FW.

143.    The Obligation was incurred on February 1, 2019, on or within two years of the Petition Date.

144.    FW did not receive reasonably equivalent value for the Obligation.  Rather, FW was induced into incurring the Obligation by the Li Defendants in furtherance of their fraudulent scheme to ruin FW more fully described above.

145.    FW historically did not purchase products from Frictionless LLC until entering agreements to sell such products to third parties.

146.    By altering this arrangement, the inventory received from Frictionless in exchange

for the Obligation would only have "reasonably equivalent value" to FW if CIU intended to and, in fact, did continue to fulfill purchase orders.

147.   Because CIU never intended to and, in fact, did not fulfill purchase orders going forward, FW was fraudulently induced to incur the Obligation. Due to CIU's failure to deliver products, FW lost the very contracts (with retailers like Lowes and Home Depot), necessary to sell the inventory at fair market value.

148.   CIU also refused to ship the parts necessary for FW to complete the US manufacture of the products delivered in incomplete form.  FW was thus left with partial products that it could not manufacture and sell.

149.   Further, the complete products received were of extremely poor quality and many were returned by retailers.  What could be sold was sold at drastically reduced prices and FW received numerous warranty claims.  Much of the inventory cannot be sold.

150.   Accordingly, FW did not receive reasonably equivalent value in exchange for the Obligation.

151.   As a result of the fraudulent scheme of which the Obligation was a central component, FW became insolvent.

152.   In addition, as a result of the fraudulent scheme of which the Obligation was a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

153.   As a result of the foregoing, the Obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

**EIGHTH CLAIM FOR RELIEF**
**FRAUDULENT CONVEYANCE – 11 U.S.C. §§ 548(a)(1)(B) and 550(a))**
**(Against Frictionless LLC and the Li Defendants)**

154.  FW incorporates by reference the allegations above, as though fully set forth herein.

155.  Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any transfer made by the debtor on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the transfer and (i) became insolvent as a result of the transfer, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay such debts matured.

156.  Between January 1, 2019 and April 29, 2019, FW pre-paid invoices to Frictionless LLC in the amount of $4,460,265.84 (the "Transfers").

157.  The Li Defendants induced FW to make the Transfers in furtherance of their fraudulent scheme to cripple FW by depleting its cash reserves and fraudulently promising to fulfill purchase orders that it had no intention of fulfilling.

158.  FW did not receive reasonably equivalent value for the Transfers as a significant portion of the Transfers were not made on account of any antecedent debt.

159.  Further, a number of the Transfers were made to pre-purchase product of substandard quality that could not be sold at historic prices.

160.  As a result of the fraudulent scheme of which the Transfers were a central component, FW became insolvent.

161.  In addition, as a result of the fraudulent scheme of which the Transfers were a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

162.  As a result of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §

548(a)(1)(B).

163.   CIU was the initial transferee of the Transfers because Frictionless LLC, the pass-through entity, acted as a mere conduit.

164.   Alternatively, CIU was an immediate or mediate transferee of the Transfers and CIU did not take the Transfer in good faith.

165.   Under either scenario, CIU and/or Li were immediate or mediate transferees of the Transfers and CIU and/or Li did not take the Transfers in good faith

166.   The Transfers are therefore recoverable from the Li Defendants pursuant to either 11 U.S.C. § 550(a)(1) or (a)(2).

### NINTH CLAIM FOR RELIEF
### BREACH OF CONTRACT—PURCHASE ORDER
#### (FW as Third-Party Beneficiary Against CIU)

167.   FW incorporates by reference the allegations above, as though fully set forth herein.

168.   FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019.  *See* Exhibit 51.

169.   Over 250 purchase orders were provided to CIU.  *See* Exhibit 57 (sample of March 2019 orders).

170.   The parties intended FW to be a third-party beneficiary of all such purchase orders, as reflected by the location for delivery of goods on each purchase order and as reflected in the FOA.  *See* Exhibit 1 at Schedule B.

171.   All products ordered through the Frictionless LLC purchase orders were to be shipped directly to FW or to contractual customers of FW.

172.   FW is a third-party beneficiary of the purchase orders.

173.   CIU accepted each of these purchase orders.

174.   Each of these purchase orders placed by Frictionless LLC and accepted by CIU

constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

175.    All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

176.    According to the terms of each purchase order, CIU was required to ship the specified number of specified products by the ship date identified on each order.

177.    Shipping the ordered product is a material term.

178.    CIU failed to ship the products.

179.    CIU has refused to ship the products.

180.    CIU's failure to ship constitutes a breach of each purchase order.

181.    FW has been severely harmed by the breach of each purchase order and has suffered damages to be proven at trial.

### TENTH CLAIM FOR RELIEF
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
### DEALING WITH RESPECT TO PURCHASE ORDERS
### (FW as Third-Party Beneficiary Against CIU)

182.    FW incorporates by reference the allegations above, as though fully set forth herein.

183.    FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019.  *See* Exhibit 51.

184.    Over 250 purchase orders were provided and accepted by CIU between August 2018 and April 2019.  *See* Exhibit 57 (sample of March 2019 orders).

185.    These orders were for the benefit of FW as reflected by the location for delivery of goods pursuant to the purchase orders and as reflected in the FOA.  *See* Exhibit 1 at Schedule B.

186.    The product ordered by the purchase orders was to be shipped directly to FW or to customers of FW.

187.    FW is a third-party beneficiary of the purchase orders.

188.   CIU accepted each of these purchase orders.

189.   Each of these purchase orders placed by Frictionless LLC and accepted by CIU constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

190.   All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

191.   The purpose of the purchase orders was for FW to receive shipments from CIU and the benefit of that bargain was to receive the products identified on the purchase order by the ship date.

192.   CIU unreasonably and in bad faith refused to ship the majority of the products ordered.

193.   In fact, correspondences from the Li Defendants and CIU managers reveal that CIU never intended to ship said products despite entering into contract to do so by accepting the purchase orders.

194.   CIU's actions in accepting the purchase orders but not intending to fill them deprived FW of the benefit of its bargain and constitutes a breach of the covenant of good faith and fair dealing.

195.   FW has been harmed by said breach and has suffered damages to be proven at trial.

**ELEVENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUDULENT MISREPRESENTATION**
**(FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)**

196.   FW incorporates by reference the allegations above, as though fully set forth.

197.   The Li Defendants, including ZL Investment, CIU, Li, Frank Li and Serena Li, owed a duty to not make or cause to be made false and misleading statements, representations, and warranties to FW concerning, among other things, CIU's cessation of shipping to competing companies and the price CIU would charge.

198.    Li and his affiliates, including representatives and agents of ZL Investment and CIU, recklessly or knowingly, and with the intent to mislead, made false representations to Banjo and FW concerning their intent to ship, sales to competition, and pricing on products shipped to FW.

199.    Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made materially false statements, representations, and warranties to FW.

200.    From 2013 – 2018, products were ordered by FW through Frictionless LLC and shipped directly to FW or its retailers.

201.    From 2013 – 2018, the Li Defendants fraudulently represented to FW, with the intent to mislead, that CIU was charging Frictionless LLC a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

202.    In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

203.    The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

204.    The fraudulent representations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

205.    From April 2013 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly represented that they were not selling to competitors of Frictionless LLC or its affiliates.  FW is an affiliate of Frictionless LLC.

206.    The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the

Li Defendants are continuing to sell to competitors of Frictionless LLC and its affiliate FW.

207.   From August 27, 2018 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly and explicitly represented the intent to ship to FW and its retailers.

208.   The Li Defendants, including their agents and representatives, were knowingly making materially false statements, representations, and warranties concerning shipments of goods.

209.   FW relied on the representations being made by the Li Defendants well into the 2019 sales season.  Those representations were false.  Based on that reliance FW did not seek an alternative source for products.

210.   The Li Defendants, including their agents and representatives, breached their duty of honesty.

211.   The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of one another and are imputed to each of them.

212.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made false statements to, *inter alia*, induce Banjo and FW to release the joint venture from any financial obligation to FW, induce payment of almost $4.5 million dollars to Frictionless LLC for pass-through to CIU, and to induce FW to take on an over 6 million dollar loan for poorly made and partially built products that would be difficult or impossible to sell.

213.   FW justifiably and reasonably relied on the false, incomplete, and misleading statements and assurances from the Li Defendants, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

214. The false statements and representations of the Li Defendants, including their agents and representatives, have caused significant injury and damage to FW.

215. FW has suffered damages in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)

216. FW incorporates by reference the allegations above, as though fully set forth.

217. Li and his affiliates, including representatives and agents of ZL Investment and CIU, had a duty to speak the truth to Banjo and FW concerning, among other things, CIU's cessation business with competing companies and accurate pricing to FW.

218. Li and his affiliates, including representatives and agents of ZL Investment and CIU, negligently misrepresented their business with competitors and pricing information to Banjo and FW.

219. ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, had a duty to Banjo and FW speak the truth concerning CIU's cessation of business with competitors and accurate pricing to FW.

220. Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made and warranties to FW.

221. From 2013 – 2018, products were ordered by FW through Frictionless and shipped directly to FW or its retailers.

222. From 2013 – 2018, the Li Defendants negligent misrepresented that CIU was charging Frictionless a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

223. In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

224.    The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

225.    The negligent misrepresentations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

226.    From April 2013 through April 2019, the Li Defendants, including their agents and representatives, negligent misrepresented that they were not selling to competitors of Frictionless or its affiliates.  FW is an affiliate of Frictionless LLC.

227.    The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the Li Defendants are continuing to sell to competitors of Frictionless and its affiliate FW.

228.    From August 27, 2018 through April 2019, ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, negligently misrepresented to FW and Banjo that CIU intended to ship products to FW and its retailers.

229.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made materially false statements, representations, and warranties concerning shipments of goods to Banjo and FW.

230.    Banjo and FW relied on the negligent misrepresentations made by ZL Investments, Li, CIU, Serena Li, and Frank Li.  Based on that reliance, at no time between August 2018 and April 2019 did FW and Banjo seek alternative sources for products.

231.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, breached their duty of honesty to Banjo and FW.

232.    The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of

one another and are imputed to each of them.

233.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made negligent misrepresentations to, among other things, induce FW to release the joint venture from financial obligations to FW, and to induce FW to pay almost $4.5 million dollars for pass-through to CIU.

234.   FW justifiably and reasonably relied on the negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

235.   The negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, have caused significant injury and damage to FW.

236.   Banjo and FW have suffered damages in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (FW Against ZL Investment, Li, and CIU)

237.   FW incorporates by reference the allegations above, as though fully set forth.

238.   ZL Investment, Li, CIU, Serena Li, and Frank Li agreed, by words and conduct, to accomplish an unlawful goal or accomplish a goal through unlawful means.

239.   ZL Investment, Li, CIU, Serena Li, and Frank Li engaged in multiple overt acts to accomplish their unlawful goals, including making false representations to FW.

240.   ZL Investment, Li, CIU, Serena Li, and Frank Li intentionally engaged in the malicious, willful, and fraudulent commission of wrongful acts for the purpose of causing FW harm, including significant pecuniary, reputational, and other damages.

241.   FW is entitled to actual and consequential damages as well as costs, including witness fees, attorneys' fees, pre-judgment and post-judgment interest, and other appropriate

equitable and legal relief, in an amount to be proven at trial, imposed jointly and severally, on ZL

Investment, Li, CIU, Serena Li, and Frank Li arising from their conspiratorial acts.

**FOURTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(FW Against the Li Defendants)**

242.   FW incorporates by reference the allegations above, as though fully set forth.

243.   Each of Li, ZL Investment, and CIU agreed to be bound by certain agreements

governing their relationship with FW and Banjo and the distribution of profits amongst them

based on the parties' joint efforts.

244.   As a result of entering into the aforementioned agreements, FW expended

significant efforts and conferred substantial monetary benefits on each of the Li Defendants, as

described above.

245.   As a result of entering into the aforementioned agreements, FW expected certain

pecuniary and reputational benefits to accrue to them.

246.   Each of the Li Defendants unlawfully diverted funds from FW, refused to perform

their obligations under the agreements described herein, and unjustly enriched themselves to the

detriment of FW.

247.   The Li Defendants received benefits in the form of profits and other advantages at

the expense of FW under circumstances that make it unjust for the Li Defendants to retain the

profits and other moneys paid without compensating FW.

248.   FW and Banjo have suffered, and will continue to suffer, expense and detriment to

the benefit of all of the Li Defendants, making it inequitable for them to retain the benefit FW

conferred on them without payment, in an amount to be proven at trial.

**I.   PRAYER FOR RELIEF**

FW seeks an award in its favor on each of the above-cited claims, as follows:

- Finding each of Li Defendants jointly and severally liable on each Claim for Relief set forth against the same above;

- Finding Defendant Frictionless, LLC liable on each Claim for Relief against Frictionless, LLC set forth above;

- Ordering Defendants to turnover and account for all estate property pursuant to 11 U.S.C. § 542;

- Enjoining Defendants from infringing on FW's intellectual property;

- Declaring the arbitration is subject to automatic stay set forth in 11 U.S.C. § 362(a) and enjoining Defendants from continued prosecution of the arbitration against Banjo;

- Disallowing or, in the alternative, equitably subordinating Frictionless LLC's claim against the estate;

- Avoiding the Obligation and the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and awarding FW the Transfers or the value thereof from CIU pursuant to 11 U.S.C. § 550(a);

- Awarding damages sufficient and adequate to compensate FW for the injuries and damage caused by the Li Defendants and Frictionless, LLC, in an amount to be determined, including, without limitation, compensatory damages, recessionary damages, and/or equitable disgorgement;

- Ordering a full accounting of the Li Defendants' affairs, including, without limitation, an accounting of all transactions between FW and CIU, CIU and each of the other Li Defendants, and CIU and any competitor of FW from 2013 to the present;

- Awarding pre-judgment and post-judgment interest, as allowed by law, and awarding Banjo his attorneys' fees and costs, and other legal and/or equitable relief as is fair and just as mandated under the LLC Agreement and/or allowed by law.

Dated this 9th day of October, 2019.

Respectfully submitted,

WADSWORTH GARBER WARNER CONRARDY, P.C.

/s/ David V. Wadsworth
David V. Wadsworth, #32066
Aaron J. Conrardy, #40030
2580 West Main Street, Suite 200
Littleton, Colorado 80120
303-296-1999 / 303-296-7600 FAX
dwadsworth@wgwc-law.com
aconrardy@wgwc-legal.com

THOMAS P. HOWARD, LLC

/s/Thomas P. Howard
Thomas P. Howard, No. 31684
Olayinka L. Hamza, No. 44523
842 W. South Boulder Rd., Ste. 100
Louisville, CO  80027
303-665-9845 / 303-665-9847 FAX
thoward@thowardlaw.com
ohamza@thowardlaw.com

Co-Counsel for Frictionless Word, LLC

OPERATING AGREEMENT
FOR
FRICTIONLESS, LLC

This Operating Agreement (this "Agreement") of Frictionless, LLC (the "Company"), dated as of April __, 2013 (the "Effective Date"), is between Li Zhixiang ("Li"), Z.L. Investment ("Z.L."), and Daniel Banjo ("Banjo" and with Z.L. the "Members"),

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and Li agree as follows:

ARTICLE I

DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the indicated meaning:

"Act" means the Colorado Limited Liability Company Act, as amended from time to time.

"Affiliate" means with respect to a Person, (1) any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, (2) any spouse, brother, sister, ascendant or descendant of any such Person or any Person described in clause (1) of this definition, and (3) any trust, family partnership or other entity established primarily for the benefit of such Person or any Person described in clauses (1) or (2) of this definition. As used in this definition, the word "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning specified in the introductory paragraph.

"Annual Operating Plan" has the meaning set forth in Section 6.5.

, "Applicable Federal Rate" means the interest rates that are published and updated monthly by the U.S. Internal Revenue Service, broken down into three classes: short-term (3 years or less), mid-term (greater than 3 years but no greater than 9 years) and long-term (greater than 9 years). Different rates are provided for annual, semi-annual, quarterly or monthly accrual.

"Available Cash" means, for a period of time, the excess of all cash receipts of the Company (including reductions in any reserves previously established by the Manager acting reasonably to meet the business needs of the Company) over all cash disbursements of the Company (including additions to any reserves established by the Manager ac[...] meet the business needs of the Company).

- 1 -

Exhibit
1

"Banjo" has the meaning specified in the introductory paragraph.

"Bankruptcy" means, with respect to a Person, any of the following acts or events: (1) making an assignment for the benefit of creditors, (2) filing a voluntary petition in bankruptcy, (3) becoming the subject of an order for relief or being declared insolvent or bankrupt in any federal or state bankruptcy or insolvency proceeding, (4) filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, (5) filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in a proceeding of the type described in clause (3) or (4) of this definition, (6) making an admission in writing of an inability to pay debts as they mature, (7) giving notice to any governmental authority that insolvency has occurred, that insolvency is pending, or that operations have been suspended, (8) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of all or any substantial part of its properties, or (9) the expiration of ninety (90) days after the date of the commencement of a proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation if the proceeding has not been previously dismissed, or the expiration of sixty (60) days after the date of the appointment, without such Person's consent or acquiescence, of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties, if the appointment has not previously been vacated or stayed, or the expiration of sixty (60) days after the date of expiration of a stay, if the appointment has not been previously vacated.

"Business" has the meaning specified in Section 2.5.

"Business Day" means any day other than a Saturday or Sunday or other day upon which banks are authorized or required to close in the State of Colorado.

"Capital Accounts" has the meaning specified in Section 8.1.

"Capital Contribution" means for any Member at the particular time in question the aggregate of the dollar amounts of any cash and cash equivalents contributed by such Member to the capital of the Company, plus the value, as determined by the Manager, of any property contributed by such Member to the capital of the Company.

"CIU" means Changzhou Inter Universal, Machine/Equipment, LTD, a Chinese company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future Law.

"Company" has the meaning specified in the introductory paragraph.

"Confidential Information" means information concerning the properties, operations, business, trade secrets, technical know-how and other non-public information and data of or relating to the Company, its properties and any technical information with respect to any project of the Company.

- 2 -

"Disability" means a physical or mental illness or disability that prevents the Manager from performing his customary duties for the Company for a continuous period of six or more months.

"Effective Date" has the meaning specified in the introductory paragraph.

"Law" or "Laws" means all applicable federal, state, tribal and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, decrees, restrictions and other similar requirements, whether legislative, municipal, administrative or judicial in nature.

"Li" has the meaning specified in the introductory paragraph. Li is an Affiliate of Z.L.

"Lien" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, charge, deposit arrangement, preference, priority, security interest, option, right of first refusal or other transfer restriction or encumbrance of any kind (including preferential purchase rights, conditional sales agreements or other title retention agreements, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction to evidence any of the foregoing).

"Manager" has the meaning specified in Section 5.1.

"Major Decision" has the meaning set forth in Section 5.4.

"Majority Voting Interest" means Members holding more than 50% of the voting power of the outstanding Units entitled to vote on a matter.

"Member" means a Person designated as an initial Member of the Company on Schedule A attached hereto by virtue of his, her, or its ownership of Units in the Company, a Person admitted as an additional Member pursuant to Section 3.4 and a Person admitted as a substituted Member pursuant to Section 11.3.

"Member Decision" has the meaning set forth in Section 5.3.

"Membership Interest" means, with respect to any Member, (1) that Member's status as a Member, (2) that Member's Capital Account and share of the Profits, Losses and other items of income, gain, loss, deduction and credits of, and the right to receive distributions (liquidating or otherwise) from, the Company under the terms of this Agreement, (3) all other rights, benefits and privileges enjoyed by that Member (under the Act or this Agreement) in his, her, or its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement, and (4) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in his, her, or its capacity as a Member.

"Notified Member" has the meaning specified in Section 11.5.1.

"Offer Notice" has the meaning specified in Section 11.5.1.

"Offered Price" has the meaning specified in Section 11.5.1.

- 3 -

"Offered Terms" has the meaning specified in Section 11.5.1.

"Offered Units" has the meaning specified in Section 11.5.1.

"Officer" and "Officers" are each defined in Section 5.10.

"Person" means a natural person, corporation, joint venture, partnership, limited liability partnership, limited partnership, limited liability limited partnership, Limited Liability Company, trust, estate, business trust, association, governmental authority or any other entity.

"Prime Rate" means a rate per annum equal to the *lesser of* (a) an annual rate of interest which equals the floating commercial loan rate as published in the Wall Street Journal from time to time as the "Prime Rate," adjusted in each case as of the banking day in which a change in the Prime Rate occurs, as reported in the Wall Street Journal and (b) the maximum rate permitted by applicable Law.

"Profit" or "Loss" means the income or loss of the Company as determined under the capital accounting rules of Treasury Regulation § 1.704-1(b)(2)(iv) for purposes of adjusting the Capital Accounts of Members including, without limitation, the provisions of paragraphs 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4) of those regulations relating to the computation of items of income, gain, deduction and loss.

"Proposed Purchaser" means a Person or group of Persons that a Member proposes as a purchaser of all or a portion of the Units of such Member.

"Securities Act" means the Securities Act of 1933, as amended from time to time. Any reference herein to a specific section or sections of the Securities Act shall be deemed to include a reference to any corresponding provision of future law.

"Selling Member" has the meaning specified in Section 11.5.1.

"Sharing Ratio" means, with respect to any Member, the percentage representing the ratio that the number of Units owned by such Member bears to the aggregate number of Units owned by all of the Members.

"Transfer" means, with respect to any asset, including Units, including any right to receive distributions from the Company or any other economic interest in the Company, a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by merger, exchange, consolidation or other operation of Law, including the following: (a) in the case of an asset owned by a natural person, a transfer of such asset upon the death of its owner, whether by will, intestate succession or otherwise, (b) in the case of an asset owned by a Person which is not a natural person, a distribution of such asset, including in connection with the dissolution, liquidation, winding up or termination of such Person (other than a liquidation under a deemed termination solely for tax purposes), and (c) a disposition in connecti  with, or in lieu of, a foreclosure of a Lien. A Transfer also shall include the transfer of a direct or indirect beneficial equity interest in a Member if the transfer, either alone or in conjunction with other such transfers made after it first became a Member, results in a change in ownership of such Member of at least 50%.

"Treasury Regulations" means regulations issued by the Department of Treasury under the Code. Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

"Unit" means any Unit issued by the Company.

"Z.L." has the meaning specified in the introductory paragraph.

## ARTICLE 2

## THE LIMITED LIABILITY COMPANY

2.1    **Formation.**  The Manager shall cause the formation of the Company pursuant to the Act and this Agreement.  The Members agree that the Company shall be governed by the terms and conditions set forth in this Agreement.  To the fullest extent permitted by the Act, this Agreement shall control as to any conflict between this Agreement and the Act or as to any matter provided for in this Agreement that is also provided for in the Act.

2.2    **Name.**  The name of the Company shall be Frictionless, LLC.

2.3    **Articles of Organization.**  The Manager shall cause articles of organization of the Company that comply with the requirements of the Act to be properly filed with the Colorado Secretary of State, and execute such further documents (including amendments to the articles of organization) and take such further action as shall be appropriate or necessary to comply with the requirements of Law for the formation, qualification or operation of a limited liability company in all states and countries where the Company may conduct its business.

2.4    **Registered Office and Agent; Principal Place of Business.**  The location of the registered office of the Company and the Company's registered agent at such address shall be determined by the Members.  The location of the principal place of business of the Company shall be at such location as the Members may from time to time select.

2.5    **Purpose.**  The business of the Company shall include the manufacture and distribution of tools and power equipment, and the conduct of any other business or activity that may be lawfully conducted by a limited liability company organized pursuant to the Act (collectively, the "Business").  The Business of the Company may be conducted directly by the Company or indirectly through another company, joint venture or other arrangement.

2.6    **The Members.**  The name, address and number and class of Units of each initial Member is set forth on Schedule A attached hereto.  Upon the admission of additional or substituted Members in accordance with this Agreement, the Manager shall update Schedule A attached hereto to reflect the then current ownership of Units.  Notwithstanding anything to the contrary herein, the update by the Manager of Schedule A pursuant to this Section 2.6 shall not be considered an amendment to this Agreement.

2.7    **Term.**  The Company shall have perpetual existence; *provided*, that the Company shall be dissolved upon the occurrence of an event set forth in Section 12.2.

## ARTICLE 3

### CAPITAL CONTRIBUTIONS

3.1    **Initial Capital Contributions.** Concurrently with the execution and delivery of this Agreement, or within twenty (20) Business Days thereof, each of the initial Members is making the initial Capital Contribution to the Company described opposite his or its respective name on Schedule A attached hereto. Initial Capital Contributions of additional Members shall be governed by Section 3.4.

3.2    **Capitalization.**

3.2.1    **Membership Interests.** All Membership Interests in the Company shall be represented by Units. Each Member shall have the number of Units as set forth opposite that Member's name on Schedule A attached hereto. Schedule A shall be amended from time to time as additional Units are issued. The Units shall not be represented by certificates. The Manager shall keep and maintain records indicating the number and Units issued to each Member and all changes, additions or reductions thereto.

3.2.2    **Units.** Upon the unanimous agreement of the Members, the Manager may issue additional Units from time to time as provided in this Agreement. The Units shall be capital interests in the Company for federal and state income tax purposes. The Units have voting rights as to all matters that Members may vote upon. Each Unit has one (1) vote.

3.3    **Additional Capital Contributions.** The Members may, but shall not be obligated to, make additional Capital Contributions to the Company in accordance with their Sharing Ratios or in any other manner as determined by the LI, subject to Section 5.4.10.

3.4    **Issuance of Additional Units.** Additional Units may be issued with such rights, privileges and preferences as shall be approved by LI, subject to Sections 3.2.2 and 5.4.9, and upon such issuance, this Agreement shall be deemed amended to the extent necessary to reflect the issuance of additional Units. If the issuance of additional Units has been properly approved in accordance with this Agreement, the Persons to whom such additional Units have been issued shall automatically be admitted to the Company as Members with respect to such additional Units, subject to the satisfaction or waiver of the requirements set forth in Section 11.4.

3.5    **No Third Party Right to Enforce.** No Person other than a Member shall have the right to enforce any obligation of a Member to contribute capital hereunder and specifically no lender or other third party shall have any such rights.

3.6    **Return of Contributions.** No Member shall be entitled to the return of any part of his, her, or its Capital Contributions or to be paid interest in respect of either his, her, or its Capital Account or his, her, or its Capital Contributions. No unrepaid Capital Contribution shall constitute a liability of the Company, or any Member. A Member is not required to contribute or to lend cash or property to the Company to enable the Company to return any Member's Capital Contributions. The provisions of this Section 3.6 shall not limit a Member's rights under ARTICLE 12.

3.7    **Discretionary Loans**. The Members may, if requested by the Manager, and subject to Section 5.4.8, but shall not be obligated to, advance all or any portion of such cash deficiency to the Company.  If more than one Member elects to make such advance, the electing Member shall make the advance in proportion to their respective Sharing Ratios, unless such Members otherwise agree. All advances m    pursuant to this Section 3.7 shall constitute a loan from the advancing Members to the Company, shall bear interest at no less than the Applicable Federal Rate and no more than the Prime Rate and shall not be considered as part of the Company's equity or Members' Capital Contributions.  Any such loan shall be subordinate to any loans from any then existing third-party lender to the Company if required by such lender, and shall be repaid prior to any other distributions to the Members.

## ARTICLE 4

### REPRESENTATIONS, WARRANTIES AND COVENANTS

4.1    **General Representations and Warranties**.  Each Member, and Li, represents and warrants to the other Members, Li, and the Company as follows:

(a)    This Agreement constitutes his, her, or its valid and binding obligation, enforceable against him, her, or it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(b)    The execution, delivery and performance by him, her, or it of this Agreement will not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of (1) any applicable Law, or (2) any agreement or arrangement to which he, she, or it or any of his, her, its Affiliates is a party or which is binding upon it or any of his, her, or its Affiliates or any of his, her, its or their assets.

(c)    Neither Member, or Li, has provided, or will provide, to any other Member, Li, or the Company, any information that is a trade secret, or otherwise confidential to a third party, unless the Member, or Li, has the right to do so.

4.2    **Conflict and Tax Representations**.  Each Member, and Li, represents and warrants to the other Members, Li, and the Company as follows:

(a)    Such Member, and Li, has been advised that (1) a conflict of interest exists among the Members' individual interests, (2) this Agreement has tax consequences and (3) he, she, or it should seek independent counsel in connection with the execution of this Agreement.

(b)    Such Member, and Li, has had the opportunity to seek independent counsel and independent tax advice prior to the execution of this Agreement and no Person has made any representation of any kind to it regarding the tax consequences of this Agreement.

(c)    This Agreement and the language used in this Agreement is the product of all Members', and Li's, efforts and each Member, and Li, hereby irrevocably waives the benefit of any rule of contract construction which disfavors the drafter of an agreement.

1.3   **Investment Representations and Warranties**.  In acquiring an interest in the Company, each Member represents and warrants to the other Members and the Company that it is acquiring such interest for his, her, or its own account for investment and not with a view to its sale or distribution.  Each Member recognizes that investments such as those contemplated by this Agreement are speculative and involve substantial risk.  Each Member further represents and warrants that the other Members have not made any guaranty or representation upon which he, she, or it has relied concerning the possibility or probability of profit or loss as a result of his, her, or its acquisition of an interest in the Company.

4.4   **Non-Competition**.  While a Member is a member of the Company, and for Li, while Z.L. is a Member of the Company, except as otherwise provided herein, each Member, and Li, agrees that he, she, or it shall, and he, she, or it shall cause his, her, or its Affiliates, to not compete with the Company, directly or indirectly, in a business substantially similar to the business of the Company or any of its subsidiaries anywhere where the Company does business, or the distribution of any products distributed by the Company or any of its subsidiaries anywhere in the world.  For purposes of this Agreement, direct and indirect competition shall include, but not be limited to, having any business or employment relationship with any past or present client, supplier, or employee of the Company, and any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of his, her, or its reputation or knowhow, to such business.  For purposes of clarification, the sale of parts and products that are materially different from parts and products that the Company sells or intends to sell shall not be considered to be competing with the Company.

4.4.1   Each Member, and Li, agrees that the covenants he, she, or it has made in this ARTICLE 4 are reasonable with respect to their duration, geographical area and proscription.  Each Member, and Li, additionally agrees that the existence of any claim or cause of action he, she, or it has against the Company, whether or not predicated upon the terms of this Agreement, shall not constitute a defense to the enforcement by the Company of these covenants.

4.4.2   In the event of a Member's, or Li's, actual or threatened breach of the provisions of this ARTICLE 4, the Company, the Members, and Li, shall have the right to obtain injunctive relief (without necessity of posting a bond) and to seek any other remedy available to the Company.

4.5   **Survival**.  The representations, warranties, and covenants set forth in this ARTICLE 4 shall survive the execution and delivery of this Agreement and any documents of Transfer provided under this Agreement, and the termination of this Agreement.

4.6   **Indemnification for Breach**.  Each Member, and Li, on behalf of such Member (or, for Li on behalf of himself) and his, her, or its successors and assigns, shall defend, indemnify and hold harmless the other Members, Li, and the Company from and against any and all claims, threats, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, damages, losses, costs and expenses (including attorneys' and experts' fees and court

- 8 -

costs) of every kind and nature arising out of, resulting from, or in connection with any breach of a representation and warranty or covenant set forth in this ARTICLE 4.

## ARTICLE 5

## COMPANY MANAGEMENT

5.1     **Manager.** The Company shall be managed by one manager, who shall be referred to herein as the "Manager".

5.2     **Management Authority.** Except for Member Decisions and Major Decisions, the Manager shall have the authority on behalf of the Company to make all decisions with respect to the Company's business without the approval of the Members. In connection with the implementation, consummation or administration of any matter within the scope of the Manager's authority, the Manager is authorized, without the approval of the Members, to execute and deliver on behalf of the Company contracts, instruments, conveyances, checks, drafts and other documents of any kind or character to the extent the Manager deems it necessary or desirable. The Manager may delegate to Officers, employees, agents or representatives any or all of the foregoing powers by written authorization identifying specifically or generally the powers delegated or acts authorized. The Manager is responsible for implementing the Annual Operating Plan.

5.3     **Decisions that Require Member Approval.** Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Member Decision unless such Member Decision has been approved by a Majority Voting Interest as provided in Section 6.2 or Section 6.3. Each of the following matters shall constitute a "Member Decision":

5.3.1     amending the Company's articles of organization or this Agreement;

5.3.2     approving the merger of the Company into or with another legal entity of any type, converting the Company into another form of legal entity or making or revoking any federal income tax election that causes the entity to be treated for federal income tax purposes as a different type of entity;

5.3.3     selling, exchanging or otherwise disposing of all or substantially all of the assets or business of the Company or terminating or ceasing all or any substantial portion of the business of the Company;

5.3.4     approving the transfer (whether by merger, consolidation, or otherwise) in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Company's Membership Interests if, after such closing, such person or group of affiliated persons would hold fifty percent (50%) or more of the outstanding Units or the outstanding voting rights of the Company (or surviving or acquiring entity);

5.3.5     liquidating, dissolving, or winding up the Company;

- 9 -

5.3.6   making any expenditure of the Company which is not in furtherance of the Business;

5.3.7   increasing or decreasing the number of Managers of the Company; and

5.3.8   approving and making all final decisions and determinations regarding the distribution of Company       to the Members other than as provided under ARTICLE 7.

5.4   **Major Decisions that Require Li's Approval.** Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by Li. The Members acknowledge and agree that although Li is not a Member, that he is an Affiliate of Z.L. and instrumental to the Company's operations, giving r se to his approval rights set forth in this Agreement.  Each of the following matters shall constitute a "Major Decision":

5.4.1   the appointment, hiring, removal, or dismissal of the Manager or any Officer or employee of the Company;

5.4.2   the compensation and benefits provided to the Manager, Officers, and employees of the Company;

5.4.3   the timing and amount of any distributions by the Company to the Members, including the distributions set forth in Sections 7.2 and 7.3;

5.4.4   the guaranty by the Company of the obligations of any third party;

5.4.5   the investment or use of the Company's funds outside of the ordinary course of the Company's business (such as the purchase of securities);

5.4.6   licensing, transferring, or otherwise providing rights to a third party in any of the Company's intellectual property, except as otherwise provided by this Agreement;

5.4.7   making any single expenditure of the Company in excess of $20,000 or any contract or commitment of the Company which could result in obligations of the Company that exceed $200,000 in any one year;

5.4.8   making any loan or other incurrence of debt of the Company in excess of $50,000 (ex       trade payables or receivables in the ordinary course of business);

5.4.9   the issuance of any new Units, redemption, purchase, or other acquisition by the Company of any Units;

5.4.10  the making of any additional Capital Contributions;

5.4.11  the commencement and the settlement of any legal or administrative claim, action, investigation, or dispute, except as otherwise provided in this Agreement; and

- 10 -

5.4.12  engaging in an affirmative act of Bankruptcy.

5.5 **Duties**.  The Manager and each Officer shall carry out his or her duties in good faith.  The Manager shall devote such time to the business and affairs of the Company for the efficient carrying on the Company's business.  The Manager and Officers shall have fiduciary duties to the Company, and the Manager's and the Officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and the Officers otherwise existing at law or in equity.

5.6 **Resignation**.  The Manager may resign at any time by giving written notice to the Members and Li.  Unless otherwise specified in the notice, the resignation will take effect upon receipt thereof by the Members and Li, and the acceptance of the resignation shall not be necessary to make it effective.  Notwithstanding the foregoing, the Manager shall be deemed to have resigned as the Manager upon the earlier of his death, Disability or adjudication of insanity or incompetence.

5.7 **Removal**.  The Manager may be removed by Li, in his reasonable discretion.

5.8 **Vacancies**.  Vacancies in the position of Manager occurring for any reason shall be filled by the vote or written consent of the Members.

5.9 **Exculpation and Indemnification**.

5.9.1  **Limitation of Liability**.  In carrying out their respective duties hereunder, the Manager and the Officers shall not be liable to the Company nor to any Member for their good faith actions or failures to act, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but shall be liable only for fraud, willful misconduct or gross negligence in the performance of their respective duties under this Agreement.

5.9.2  **Reliance**.  To the extent the Manager or the Officers have duties (including fiduciary duties) and liabilities relating thereto to the Company, to any Member, or Li, the Manager or the Officers acting under this Agreement shall not be liable to the Company, to any Member, or to Li for such Person's good faith reliance on the provisions of this Agreement, the records of the Company, and such information, opinions, reports or statements presented to the Company by any of the Company's other Officers or employees, or by any other Person as to matters the Manager or any such Officer reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act.

5.9.3  **No Personal Liability**.  Neither the Manager nor any Officer, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being the Manager or an Officer or any combination of the foregoing.

5.9.4  Indemnification.  The Company shall indemnify and hold harmless the Manager, his Affiliates and any Officer or employee of the Company, to the fullest extent permissible under applicable law, from and against any loss, liability, judgment, damages, amounts paid in settlement or expense, including, without limitation, reasonable attorneys' and accountants' fees and disbursements, arising from or in connection with any threatened or actual claim, action, suit or proceeding and any appeal therein, including any brought by or in the right of the Company, if the Manager, or any such Affiliate, Officer or employee acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and provided that his, her, or its conduct is not adjudged to have constituted gross negligence, willful misconduct or an intentional breach of his, her, or its fiduciary obligations in the performance of his, her, or its duties to the Company.  The termination of any action, suit or proceeding by judgment, order or settlement shall not, of itself, create a presumption that the Manager, or any such Affiliate, Officer or employee did not act in good faith or in a manner reasonably believed to be in or not opposed to the best interests of the Company.

5.9.5  Insurance.  The Company may purchase and maintain insurance on behalf of the Manager, his Affiliates and any Officers or employees of the Company with respect to any liability or expense against which the Company would be obligated to indemnify such Persons pursuant to this Section 5.9.  In no event shall the Company bear any portion of the cost of any liability insurance which insures the Manager, his Affiliates or any Officers or employees of the Company against any liability as to which indemnification is not allowed under this Section 5.9.

5.9.6  Other Rights.  The indemnification and advancement of expenses provided by this Section 5.9 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may otherwise be entitled.

5.10  Officers.

5.10.1  Appointment.  The Manager may, subject to Section 5.4.1, from time to time, nominate one or more individuals to be officers of the Company (each an "Officer", and collectively "Officers"), subject to the rights, if any, of an Officer under any contract of employment.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the Officers shall be fixed from time to time by Li, subject to Section 5.4.1.

5.10.2  Duties of Officers.  In all cases where the duties of any Officer are not prescribed by this Agreement, such Officer shall have the duties that are normally associated with his or her title, and follow the orders, instructions, and limitations on authority provided by the chairman and the Manager, except that in any event each Officer shall exercise such powers and perform such duties as may be required by law.  The Officers shall have the following specific duties:

5.10.2.1  Duties of Chairman.  The chairman shall supervise the operations of the Company.  He shall chair all meetings of the Members, and if there is no president, the chairman shall exercise the powers and perform the duties of the president.  Li shall be the chairman, to serve until his death or resignation, or until Li appoints a successor chairman.

- 12 -

5.10.2.2    Duties of President.  The president shall have general and active control of the Company's affairs and business and general supervision of its Officers, agents and employees.

5.10.2.3    Finance Officer.  Li has the authority to designate a Person to serve as the finance officer of the Company, who shall be no less qualified than a certified public accountant, and who shall have such title as Li determines. The finance officer shall: (a) be the principal accounting officer of the Company and as such prescribe and maintain the methods and systems of accounting to be followed, keep complete books and records of account, prepare and file all local, state and federal tax returns, prescribe and maintain an adequate system of internal audit and prepare and furnish to the chairman and Manager statements of account showing the financial position of the Company and the results of its operations; (b) upon request of the Manager or the chairman, make such reports as may be required at any time; (c) provide the chairman and the Manager with quarterly financial reports (with such content and in such form as reasonably requested by the chairman or Manager) within three (3) Business Days of the end of each fiscal quarter of the Company; and (d) provide the chairman and the Manager with annual financial reports for the previously completed fiscal year (with such content and in such form as reasonably requested by the chairman or Manager) by March 1 of each year.

5.10.3  Resignation and Removal.  Any Officer may resign at any time by giving written notice thereof to the Manager and Li. Except for the chairman (who may not be removed), any Officer may be removed, either with or without cause, by either the Manager, subject to Section 5.4.1, or the chairman, whenever in their judgment the best interests of the Company will be served thereby; *provided, however,* that such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an Officer shall not, by itself, create contract rights.

5.11    Salary.  The salary of the Manager shall be determined by Li. Members may review the Manager's salary in the Annual Meeting, and fix it with the written consent of Li. The Manager shall additionally be entitled to reimbursement from the Company for out-of-pocket costs and expenses reasonably incurred by the Manager for or on behalf of the Company.

5.12    Affiliate Transactions.  Upon the approval of Li, the Manager may cause the Company to enter into transactions, agreements, contracts and undertakings with the Manager, any Member, or any of their respective Affiliates, so long as such transactions, agreements, contracts or undertakings are in the ordinary course of business and on commercially reasonable terms and conditions.

## ARTICLE 6

## MEMBERS

6.1    Limited Liability.  The liability of each Member shall be limited as provided by the Act. Except as permitted under this Agreement, a Member shall take no part in the control, management, direction or operation of the affairs of the Company, and shall have no power to bind the Company in his, her, or its capacity as a Member.

- 13 -

6.2    **Quorum and Voting**.  Except as otherwise stated below, a Majority Voting Interest, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. One or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of a Majority Voting Interest shall be approval of the action by the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

6.3    **Informal Action**.  Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by a Majority Voting Interest, unless this Agreement requires the approval of a greater number, or class, of Members for such action to be taken, in which case such written consent must be signed by the requisite number of Members required to approve such action. Action taken under this Section 6.3 shall be effective when the required number of Members have signed the consent, unless the consent specifies a different effective date.

6.4    **Meetings**.  Meetings of the Members for any purpose or purposes may be called by the Manager or by Members holding not less than a majority of the issued Units.

6.4.1    **Place of Meeting**.  The Manager or the Members calling a meeting may designate the place for any meeting either inside or outside the state of Colorado.

6.4.2    **Notice of Meeting**.  Written notice stating the place, day and hour of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered pursuant to ARTICLE 13, by or at the direction of the Manager or the Member calling the meeting, to each Member of record entitled to vote at such Meeting. Meetings of the Members may be called upon not less than ten (10) days' written notice.

6.4.3    **Proxies**.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his, her, or its duly authorized attorney-in-fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

6.4.4    **Conduct of Meeting**.  The chairman, or his designee, shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting. Following each meeting, the minutes of the meeting shall be sent to the Manager and each Member.

6.4.5    **Remote Participation**. The Manager or the Member calling a meeting shall provide for Members to participate in such meeting by telephone or other means of remote communication which is reasonably accessible to all Members and through which all of the participants can hear one another.

6.5    **Members' Annual Meeting**, the Members, and Li, shall have an annual meeting, which shall take place in the last quarter of each fiscal year of the Company, at such time and at

- 14 -

such place (or by such forms of telephonic or electronic communication) as determined by the agreement of all of the Members and Li. At the Members' Annual Meeting, the Members and Li shall review the annual operating plan, prepared by the Manager, for the next fiscal year, including items such as the hiring of employees and contractors, the remuneration of employees, officers, and the Manager, the Company's budget, distributions by the Company to the Members, and new products of the Company (the "Annual Operating Plan"). The Annual Operating Plan shall be approved by the Members, in writing, in accordance with their Sharing Ratios, and also by Li. The Annual Operating Plan for 2013 is attached hereto as Schedule B.

6.6     No Member Fees. Except as otherwise provided in this Agreement, no Member shall be entitled to compensation for attendance at Member meetings or for time spent in his, her, or its capacity as a Member.

6.7     No State-Law Partnership.   The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Manager be a partner or a party of a joint venture of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.  Except as otherwise required by the Act, other applicable Law, and this Agreement, no Member shall have any fiduciary duty to any other Member.

6.8     Tax Matters Partner. Li shall appoint the "tax matters partner" as such term has the meaning specified in section 6231(a)(7) of the Code.  The appointment of any successor tax matters partner shall be approved by Li.  Subject to the provisions hereof, the tax matters partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Notwithstanding the foregoing, the tax matters partner shall promptly notify all Members of the commencement of any audit, investigation or other proceeding concerning the tax treatment of Company tax items and shall keep all Members adequately informed of such proceedings.

The tax matters partner shall make or cause to be made all available elections as required by the Code and the Treasury Regulations to cause the Company to be classified as a partnership for federal income tax purposes.

## ARTICLE 7

## DISTRIBUTIONS TO THE MEMBERS

7.1     Minimum Distribution to Pay Tax.  By March 1 of each year, the Company shall make distributions to the Members sufficient to enable them to pay their federal, state, or other United States income tax liability attributable to the net income of the Company during the prior tax year.

7.2     Non-Liquidating Distributions.  Subject to Section 5.4.3, the Manager may cause the Company to make distributions of Available Cash in such aggregate amounts and at such times as Li may determine in conformance with the Annual Operating Plan.  All non-liquidating distributions shall be made to the Members in accordance with their Sharing Ratios,

- 15 -

7.3     **Liquidating Distributions.**  Distributions made in connection with the sale or exchange of all or substantially all of the Company's assets and all distributions made in connection with the liquidation of the Company shall be made after applying the provisions of ARTICLE 12 to the Members in accordance with their Sharing Ratios.

7.4     **Distributions in Kind.**  During the existence of the Company, no Member shall be entitled or required to receive as distributions from the Company any Company asset other than money.  In-kind distributions of assets in connection with the dissolution and winding-up of the Company shall be governed by ARTICLE 12.

## ARTICLE 8

### ALLOCATION OF PROFITS AND LOSSES

8.1     **Capital Accounts.**  The Manager shall cause the Company to maintain a separate capital account for each Member and such other Member accounts as may be necessary or desirable to comply with the requirements of applicable Law ("Capital Accounts").  No Member may withdraw any part of his, her, or its Capital Account.

8.2     **Allocation of Profits and Losses.**  Each Member's Capital Account shall be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to such Member of Profits.  Each Member's Capital Account shall be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to such Member of Losses.

8.3     **Transfers During Year.**  In order to avoid an interim closing of the Company's books, the allocation of Profits and Losses under ARTICLE 8 between a Member who Transfers part or all of its interest in the Company during the Company's accounting year and his, her, or its transferee, or to a Member whose Sharing Ratio varies during the course of the Company's accounting year, may be determined pursuant to any method chosen by the Manager, in consultation with the finance officer, and such Member; *provided, however,* that any Profit or Loss attributable to extraordinary items related to the sale of Company property shall be allocated to the owner of the interest in the Company at the time the Profit or Loss attributable to the extraordinary item was realized.

8.4     **Compliance with the Internal Revenue Code and Regulations.**  Capital Accounts shall be maintained in accordance with the provisions of this Operating Agreement, the Code, and the Treasury Regulations.  To the extent that there is a conflict between the provisions of this Operating Agreement and the Code or the Treasury Regulations, then the Capital Accounts shall be maintained in accordance with the Internal Revenue Code and the Regulations.

- 16 -

## ARTICLE 9

### INTELLECTUAL PROPERTY

9.1     **License to Existing intellectual property**.  Banjo shall ensure that the Company has the right to use freely, any patents (whether registered in the United States or elsewhere) that relate to CIU products that are within his control, and any new patents that relate to CIU products which are in his control while he is a Member of the Company. Banjo represents and warrants to Li that as of the Effective Date, except as set forth in this Agreement, he has not granted any license, or assigned any rights in, any patents which he owns or otherwise has the right to use to any third party which Banjo does not control.

9.2     **Existing intellectual property Representations**. The Company shall defend CIU with respect to any claim, lawsuit, legal action, or penalty that is based on or attributable to any of the patent licenses set forth in Section 9.1, and shall notify Mr. Li promptly of these matters that may come to its attention. Meanwhile, the Company shall indemnify CIU, and hold it harmless from and against any loss, damages, liability and any costs, expenses and reasonable attorneys' fees finally awarded that relate to the patent licenses set forth in Section 9.1.

9.3     **Ownership of Company Intellectual Property**. All intellectual property developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company. And the Company shall provide CIU with a worldwide, perpetual, royalty free license to all of its intellectual property once the intellectual property is developed.

9.4     **Intellectual Property Protection**. Upon the approval of Li, the Manager shall cause the Company to take reasonable actions to protect and defend the intellectual property of the Company, including acquiring such registrations in the United States and elsewhere. Notwithstanding anything to the contrary set forth in this Agreement, the Manager may cause the Company to take legal action to defend and protect its intellectual property rights, notwithstanding Section 5.4.11, although he shall promptly inform Li of any such actions being taken.

## ARTICLE 10

### ACCOUNTING AND REPORTING

10.1    **Books**. The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs at the principal office of the Company. The Company's books shall be kept in accordance with generally accepted accounting principles, consistently applied, and on an accrual basis method of accounting, or upon on such other method as determined by the finance officer and agreed upon by the Manager and Li. Subject to the requirements of applicable Law, the fiscal year of the Company shall be the same as the taxable year of the Company, which shall end on December 31 of each year.

10.2    **Reports**. The Manager shall cause the Company to deliver to the Members such financial and tax information, returns and reports as may be reasonably requested.

- 17 -

10.3   **Inspection of Documents.** Each Member, and Li, shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company, and all other items prepared by or obtained by the Manager in connection with the performance of his duties hereunder, in each case at such Member's (or Li's, as applicable) expense during reasonable business hours and with at least five (5) Business Days prior written notice to the Manager.

## ARTICLE 11

### TRANSFER OF MEMBER'S INTEREST

11.1   **Restrictions on Transfers and Liens.** No Member shall Transfer or create a Lien on all or any portion of his, her, or its Units except as expressly permitted by this ARTICLE 11. Any attempted Transfer of, or creation of a Lien on, any Unit not in accordance with the terms of this ARTICLE 11 shall be null and void and of no legal effect.

11.2   **Permitted Transfers and Liens.** Any Transfers and Liens permitted under this Section 11.2 shall be subject to the other provisions of this ARTICLE 11. A Member may Transfer all or any portion of his, her, or its Units as follows:

(a)     A Member may Transfer all or any portion of his, her, or its Units to any other Member without the consent of any Member (besides the Members who are parties to the Transfer);

(b)     A Member may Transfer all or any portion of his, her, or its Units to an Affiliate of such Member without the consent of any other Member, provided that the transferring Member provides notice of such Transfer to the other Members at least ten (10) Business Days prior to effecting the Transfer;

(c)     A Member who is a natural person may Transfer all or a portion of his Units in connection with estate planning transfers for the benefit of one or more relatives (e.g., transfers to family trusts or family partnerships, limited partnerships, limited liability companies, or limited liability limited partnerships), provided that such Member continues to have and to exercise control over such Units, without the consent of any other Member.

11.3   **Substitution of a Member.**

11.3.1 **Obligations.** No Transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest Transferred, and shall have agreed to be bound by all the terms and conditions hereof, by written instrument duly acknowledged, in form and substance reasonably satisfactory to the Manager. Without limiting the foregoing, any transferee that has not become a substituted Member shall nonetheless be bound by the provisions of this ARTICLE 11 with respect to any subsequent Transfer. Upon admission of the transferee as a substituted Member, the transferor shall have no further obligations under this Agreement with respect to those Units Transferred to the transferee; *provided, however,* no Member or former Member shall be released, either in whole or in part, from any liability of such Member to the Company pursuant to this Agreement or otherwise

- 18 -

which has accrued through the date of such Transfer (whether as the result of a voluntary or involuntary Transfer) of all or part of such Member's interest in the Company unless the Manager agrees to any such release.

11.3.2   Conditions to Substitution.   As conditions to his, her, or its admission as a Member (1) any assignee, transferee or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary, and (2) such assignee, transferee or successor shall pay all reasonable expenses in connection with his, her, or its admission as a substituted Member.

11.4   Admission as a Member.   No Person shall be admitted to the Company as a Member unless either (1) the Units acquired by such Person have been registered under the Securities Act, and any applicable state securities laws or (2) the Manager has received a favorable opinion of the transferor's legal counsel or of other legal counsel acceptable to the Manager to the effect that the Transfer of the Units to such Person is exempt from registration under those Laws. The Manager, however, may waive the requirements of this Section 11.4.

11.5   Right of First Refusal.

11.5.1   Limitations on Transfer.   Except as otherwise provided in Section 11.1 or 11.2, no Member (the "Selling Member") may Transfer all or any portion of his, her, or its Units to any Proposed Purchaser, unless the Selling Member has received a bona fide written offer from the Proposed Purchaser, and the Selling Member first provides a written offer notice (an "Offer Notice") to the other Members (the "Notified Members") stating that the Selling Member desires to Transfer all or a portion of his, her, or its Units, designating the number of Units (the "Offered Units") that the Selling Member desires to Transfer, and specifying the proposed purchase price (the "Offered Price"), the name and address of the Proposed Purchaser, and all of the other proposed material terms and conditions of the proposed Transfer, of the Offered Units (the "Offered Terms"), in each case as set forth in the offer from the Proposed Purchaser.   In addition, the Selling Member shall include with the Offer Notice a copy of the Proposed Purchaser's offer.

11.5.2   Election to Purchase.   Each Notified Member shall have the right, but not the obligation, for a period of twenty (20) Business Days after his, her, or its receipt of the Offer Notice, to elect to purchase all, but not less than all, of his Pro Rata Share of the Offered Units for the Offered Price and on the other Offered Terms. Any such election shall be made by providing written notice of such election to the Selling Member within such 20-Business Day period.

11.5.3   Closing.   If a Notified Member timely elects to purchase the Offered Units, the parties shall close the sale of the Offered Units for the Offered Price and on the Offered Terms on the later of thirty (30) Business Days after the Selling Member provides the Offer Notice, and five (5) Business Days after the receipt of all required consents and approvals, if any, with respect to such Transfer from all governmental authorities. If more than one Notified Member timely elects to such Transfer the Offered Units, the Notified Members shall purchase the Offered Units pro rata in proportion to their respective Sharing Ratios.   If no Notified Member elects to purchase the Offered Units or the Notified Members that elect to purchase the Offered

- 19 -

Units fail to close the purchase thereof within the time period specified above (subject to the rights of the Notified Members under Section 11.5.2), the Selling Member may Transfer all, but not less than all, of the Offered Units to the Proposed Purchaser during the *later of* the 90-day period following the expiration of such 20-Business Day election period, or if the Notified Members that elect to purchase fail to close within the time specified in clauses (i) and (ii) above, the 90-day period following the expiration of such period, but only for a cash value of the consideration to be received by the Selling Member from the Proposed Purchaser that is greater than or equal to the Offered Price and on the Offered Terms. If the Selling Member does not sell the Offered Units in accordance with the terms described above within such 90-day period, the Selling Member shall again afford the Notified Members the purchase rights set forth in this Section 11.5, with respect to any offer to sell, assign or dispose of all or any portion of the Offered Units or any other Units held by the Selling Member.

## ARTICLE 12

### WITHDRAWAL, DISSOLUTION AND TERMINATION

12.1   <u>Withdrawal</u>.  No Member shall have any right to voluntarily withdraw from the Company.  Notwithstanding the foregoing, a Member be deemed to withdraw from the Company upon the Bankruptcy of such Member.  When a transferee of all or any portion of a Member's Units becomes a substituted Member pursuant to Section 11.3, the transferring Member shall cease to be a Member with respect to the Units so Transferred.

12.2   <u>Dissolution</u>.  The Company shall be dissolved upon the occurrence of any of the following:

    (a)   Upon the unanimous approval of the Members; or

    (b)   The sale of all or substantially all of the assets of the Company.

12.3   <u>Liquidation</u>.  Upon dissolution of the Company under Section 12.2, Li shall appoint in writing one or more liquidators (who may be Members or the Manager) who shall have full authority to wind up the affairs of the Company and to make a final distribution as provided herein.  The liquidator shall continue to operate the Company properties with all of the power and authority of the Manager.  The steps to be accomplished by the liquidator are as follows:

    (a)   As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed, as appropriate, including in such accounting the Profit or Loss resulting from the actual or deemed sale or distribution of the Company's properties.

    (b)   The liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefore (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).  The liquidator shall then, by payment of cash or property (at the election of the liquidator, and, in the case of property, valued as of the date of

- 20 -

termination of the Company at its fair market value by an appraiser selected by the liquidator), distribute all remaining amounts to the Members in accordance with ARTICLE 7. For purposes of this ARTICLE 12, a distribution of an asset or an undivided interest in an asset in-kind to a Member shall be considered a distribution of an amount equal to the fair market value of such asset or undivided interest. Each Member shall have the right to designate another Person to receive any property that otherwise would be distributed in kind to that Member pursuant to this Section 12.3.

(c)   Any real property distributed to the Members shall be conveyed by special warranty deed and shall be subject to the operating agreements and all Liens, contracts and commitments then in effect with respect to such property, which shall be assumed by the Members receiving such real property.

(d)   Except as expressly provided herein, the liquidator shall comply with any applicable requirements of the Act and all other applicable Laws pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

(e)   The distribution of cash or property to the Members in accordance with the provisions of this Section 12.3 shall constitute a complete return to the Members of their respective Capital Contributions and a complete distribution to the Members of their respective interests in the Company and all Company property. Notwithstanding any other provision of this Agreement, no Member shall have any obligation to contribute to the Company, pay to any other Member or pay to any other Person any deficit balance in such Member's Capital Account.

12.4   **Articles of Dissolution.**   Upon the completion of the distribution of the Company's assets as provided in this ARTICLE 12, the Company shall be terminated and the Person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

13.1   **Method of Notices.**   All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by reputable international delivery service (such as UPS or FedEx), or by email if delivery is confirmed, and shall be effective when personally delivered, or, if sent by courier, on the date set forth on the delivery receipt, or if sent by email, upon receipt of confirmation, at their respective addresses set forth on Schedule A attached hereto. Any Member, Li, or the Manager may give notice from time to time changing his, her, or its respective address for that purpose.

13.2   **Computation of Time.**   In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday or Sunday, in which event the period shall run until the end of the next day which is not a Saturday or Sunday.

## ARTICLE 14

### GENERAL PROVISIONS

14.1    **Amendment**.  This Agreement may not be amended except by an instrument signed and approved by all of the Members and Li.

14.2    **Waiver**.  Except as otherwise provided herein, rights hereunder may not be waived except by an instrument in writing signed by the Member sought to be charged with the waiver, or, if applicable, Li.

14.3    **Confidentiality**.  Each Member, Li, and the Manager will keep confidential and not use, reveal, provide or transfer to any third party any Confidential Information he, she, or it obtains or has obtained concerning the Company, except (1) to the extent that disclosure to a third party is required by applicable Law; (2) information which, at the time of disclosure, is generally available to the public (other than as a result of a breach of this Agreement or any other confidentiality agreement to which such Person is a party or of which it has knowledge), as evidenced by generally available documents or publications; (3) information that was in his, her, or its possession prior to disclosure (as evidenced by appropriate written materials) and was not acquired directly or indirectly from the Company; (4) to the extent disclosure is necessary or advisable, to his, her, its, or the Company's employees, consultants or advisors for the purpose of carrying out their duties hereunder; (5) to banks or other financial institutions or agencies or any independent accountants or legal counsel or investment advisors employed by the Manager, the Company, Li, or any Member, to the extent disclosure is necessary; (6) to the extent necessary, disclosure to third parties to enforce this Agreement, or (7) to a Member, Li, or the Manager or to their respective Affiliates; *provided*, *however*, that in each case of disclosure pursuant to (4), (5), (6), or (7), the Persons to whom disclosure is made agree to be bound by this confidentiality provision. The obligation of each Member and the Manager not to disclose Confidential Information except as provided herein shall not be affected by the termination of this Agreement or the replacement of the Manager or substitution of any Member.

14.4    **Public Announcements**.  Except as required by Law, no Member, or Li, shall make any press release or other public announcement or public disclosure relating to this Agreement, the subject matter of this Agreement or the activities of the Company without the consent of the Manager.

14.5    **Applicable Law**.  This Agreement shall be construed in accordance with and governed by the laws of the State of Colorado, United States, excluding its conflicts of laws rules.

14.6    **Arbitration; Consent to Jurisdiction**.

14.6.1    **Arbitration**.  Each Member and Li on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li to arbitration in accordance with the provisions and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court, in the State

- 22 -

of Colorado, United States pursuant to Section 14.6.2. Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose: (a) all questions relating to the interpretation or breach of this Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists. Notwithstanding the foregoing, each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.

14.6.2. Exclusive Jurisdiction. Each Member, and Li on his, her, or its own behalf and on behalf of the Company, hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Colorado, United States, to seek injunctive relief and to enforce arbitral awards, without regard to and irrespective of any claims of *forum non conveniens*, in respect of all claims arising in connection with the Company, the provisions of this Agreement and all related matters.

14.6.3 *Procedures*. Such arbitration procedures shall be conducted before a panel of three arbitrators, sitting in a location selected by mutual agreement within the City of Denver, Colorado in accordance with the rules for commercial arbitration of the American Arbitration Association then in effect—with each Party selecting one arbitrator and the two arbitrators so selected themselves selecting the third—except that: (i) each arbitrator shall agree to treat as confidential all evidence and other information presented by the parties; (ii) the arbitrators shall have no authority to amend or modify any of the terms of this Agreement or of any related agreement; and (iii) the arbitrators shall have fourteen (14) days from the later of the closing statements or the submission of post-hearing briefs by the parties to render their decision. The arbitration shall take place entirely in English.

14.6.4 Authority. The arbitrators shall have the authority to award any remedy or relief that a court of competent jurisdiction could order or grant.

14.6.5 Judgment. Judgment may be entered on the arbitrators' award in any court having competent jurisdiction; however, the parties hereto each consent to the jurisdiction of the state and federal courts located in the State of Colorado with respect to any proceeding to enter judgment upon the arbitrators' award, without regard to and irrespective of any claims of *forum non conveniens*.

14.6.6 Statute of Limitations. The arbitration procedures set forth herein shall in no respect be construed to prevent a Party from instituting formal proceedings at any time to avoid the expiration of any applicable statute of limitations or to preserve a senior position with respect to creditors.

14.6.7 Enforcement. These arbitration procedures specifically contemplate that the Members, Li, and the Manager shall be entitled to seek enforcement of this Agreement in any court of competent jurisdiction to the fullest extent permitted by law, by seeking any remedy available in equity, including but not limited to a temporary restraining order, preliminary and/or temporary injunctive relief and specific performance, until the arbitration award is rendered or

- 23 -

the controversy is otherwise resolved, without having to arbitrate and without need to post any bond.

14.6.8 Continuing Obligations. During the period before and during any arbitration to settle any controversy hereunder, the Parties shall continue to fulfill their duties under this Agreement.

14.7 Costs of Dispute. In any dispute that arises under this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees and costs, including court costs and arbitration fees, from the losing Party.

14.8 Costs of this Agreement. Each Party shall pay his or its own costs associated with this Agreement.

14.9 Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

14.10 References. References to a Member or the Manager, including by use of a Pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, partnerships or corporations where applicable. References in this Agreement to terms in the singular shall include the plural and vice versa.

14.11 U.S. Dollars. References herein to "Dollars" or "$" shall refer to U.S. dollars and all payments and all calculations of amounts hereunder shall be made in Dollars.

14.12 Counterparts. This instrument may be executed in any number of counterparts each of which shall be considered an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by facsimile transmission or by email in .pdf format shall be as effective as delivery of a manually executed counterpart of this Agreement.

14.13 Language. This Agreement is executed in both Chinese and English. The Parties agree that both language versions shall have equal validity and legal effect. Each Party acknowledges that it has reviewed both language texts and they are substantially the same in all material respects.

14.14 Additional Documents. The Members hereto covenant and agree to execute such additional documents and to perform additional acts as are or may become necessary or convenient to carry out the purposes of this Agreement.

14.15 No Third Party Beneficiaries. This Agreement is for the sole benefit of the Members, the Manager, and the Company, and no other Person is intended to be a beneficiary of this Agreement or shall have any rights hereunder.

14.16 Representation. The parties acknowledge that Izbiky & Associates PLLC prepared this Operating Agreement as the attorney for the Company and not as the attorney for

- 24 -

any of the Members or Li. Each Member and Li is advised to seek separate tax and legal counsel to the extent she considers advisable.

*[Signature page follows.]*

The parties have executed this Agreement to be effective as of the Effective Date.


MEMBERS:


Daniel Banjo

Z.L. Investment

By: _____

Name: _____JUN LI_____

Title: _____GM_____

LI ZHIXIANG

Li Zhixiang

### SCHEDULE A

MEMBERS, ADDRESSES, UNITS

| Members | Address | Initial Capital Contribution | Units | Sharing Ratio |
|---|---|---|---|---|
| Z.L. Investment | | $1,800,000 | 900,000 | 90% |
| Daniel Banjo | 3278 Folsom St. Boulder, CO 80304 Email: dbanjo@frictionlessworld.com | $200,000 | 100,000 | 10% |

Li's address for notice is:

Li Zhixiang
Changzhou Inter Universal Machinery/Equipment Company
Zhoiqiao Town,
Wujin, Changzhou, Jiangsu, China 213117
Email:

SCHEDULE B

2013 BUSINESS PLAN

# 2013 Annual Operating Plan for Frictionless LLC

## (Schedule B)



# Frictionless World



April 11, 2013
By: D. Banjo
Presented to Mr. Li and ZL Investments



Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page 30 of 197

# Operating Plan Agenda

- Employee Plan
- Expense Considerations
- Product and Sale Plans
- TSC Plan
- Company structure and flow
- Questions?



Frictionless World

Confidential – Do not share

# Employee Plan

- Employee plan for 2013 through Dec 2013
  - Dan Banjo
  - (2) engineers – Hiring now, replacing previous
  - Head of sales, Scott Forristall
  - CFO – Need to hire, replace Margie.
  - Graphic Designer – Bruce Clark
  - Warehouse worker – for shipping and receiving
  - Employees that left: Will, Stephen, Andrew

- Issues affecting the business: Providing Health Care for employees. Possible law changes. Insurance umbrella we needed to purchase to start business with HomeDepot. They needed $8 million coverage. Shopping insurance carrier.

- Getting employees set up in new warehouse. Working on 3rd party IT support.



FrictionlessWorld

Confidential – Do not share

3

Initial budget provided in Dec for support of Frictionless LLC business. Not up to date with latest expenses.

| | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 |
|---|---|---|---|---|---|---|---|---|
| | 12/1/2013 | 1/1/2013 | 2/1/2013 | 3/1/2013 | 4/1/2013 | 5/1/2013 | 6/1/2013 | 7/1/2013 |
| | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 2 | Year 2 |
| **Fixed Personnel Costs** | | | | | | | | |
| Dan Banjo | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Senior Design Engineer | $3,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| Customer Service Representative to answer phones | $0 | $0 | $0 | $0 | $0 | $4,250 | $4,250 | $4,250 |
| Junior Design Engineer | $500 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Marketing and advertising | $1,500 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 |
| Jr. Sales Manager (Andrew) | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Office assistant | $0 | $0 | $0 | $0 | $2,800 | $2,800 | $2,800 | $2,800 |
| Supply Chain manager | $0 | $0 | $0 | $0 | $6,000 | $6,000 | $6,000 | $6,000 |
| Warehouse Manager | $0 | $0 | $0 | $0 | $0 | $5,000 | $5,000 | $5,000 |
| Warehouse workers | $0 | $0 | $0 | $0 | $2,500 | $2,500 | $2,500 | $13,500 |
| IT Engineer (contracted out / part time) | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| Accounting | $0 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Employment taxes / Healthcare (State and Federal) | $7,200 | $12,240 | $12,240 | $12,240 | $15,856 | $18,816 | $18,816 | $22,336 |
| SUM of Personnel Costs (monthly) | $29,700 | $50,490 | $50,490 | $50,490 | $65,406 | $77,616 | $77,616 | $92,136 |
| **Fixed and Variable Costs EXCLUDING Personnel** | | | | | | | | |
| Company offices and small starting warehouse | $15,876 | $15,876 | $15,876 | $15,876 | $15,876 | $15,876 | $15,876 | $15,876 |
| Utilities monthly | $1,100 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,000 | $1,000 |
| General office expenses (phones, fax, copier, internet) yearly | $1,850 | $1,850 | $1,850 | $1,850 | $1,850 | $1,850 | $1,850 | $1,850 |
| Insurance on liability and space, equipment and product sold | $0 | $0 | $0 | $0 | $1,000 | $1,000 | $1,000 | $1,000 |
| Travel international per year @ 4K / week | $0 | $6,000 | $6,000 | $6,000 | $6,000 | $3,000 | $3,000 | $3,000 |
| Domestic travel to sell and launch product | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Samples from suppliers yearly | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Air Freight (lbs. of freight per year @ $4/lb.) | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Ship samples to customer domestically | $3,900 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $1,500 | $1,500 |
| Legal/Patent work (need to finish patents) | $0 | $0 | $0 | $0 | $0 | $0 | $1,000 | $1,000 |
| ERP Computer System | $0 | $0 | $0 | $0 | $0 | $0 | $25,000 | $25,000 |
| SUM of Fixed & Variable Costs EXCLUDING Personnel (monthly) | $26,226 | $31,026 | $31,026 | $31,026 | $32,026 | $29,026 | $53,726 | $53,726 |
| **Start Up / Growing Costs** | | | | | | | | |
| Used desks, phone, chairs | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |
| Computers, and office equipment | $6,000 | $3,000 | $2,000 | $2,000 | $0 | $1,000 | $1,000 | $1,000 |
| Warehouse / shipping equipment tools | $0 | $3,500 | $2,250 | $500 | $500 | $500 | $750 | $750 |
| Trade shows | $0 | $0 | $3,000 | $1,000 | $3,000 | $0 | $0 | $0 |
| SUM of Start Up / Growing Costs (monthly) | $6,250 | $6,750 | $7,500 | $3,750 | $3,750 | $1,750 | $2,000 | $2,000 |
| **Monthly Sum of Expenses** | $62,176 | $88,266 | $89,016 | $85,266 | $101,182 | $108,392 | $133,342 | $147,862 |
| **Profit / Loss per month** | | | | | | | | |
| Estimated OE sales | $0 | $0 | $0 | $20,000 | $40,000 | $50,000 | $100,000 | $100,000 |
| Estimated OE Profit (not including OH) 30% | $0 | $0 | $0 | $6,000 | $12,000 | $15,000 | $30,000 | $30,000 |
| Estimated log splitter sales | $0 | $0 | $0 | $50,000 | $200,000 | $250,000 | $350,000 | $700,000 |
| Estimated log splitter profit (not including OH) 20% | $0 | $0 | $0 | $10,000 | $40,000 | $50,000 | $70,000 | $140,000 |
| Estimated PHD sales | $0 | $0 | $0 | $0 | $20,000 | $20,000 | $20,000 | $20,000 |
| Estimated PHD profit (not including OH) 30% | $0 | $0 | $0 | $0 | $6,000 | $6,000 | $6,000 | $6,000 |
| Estimated parts and accessories | $0 | $0 | $0 | $0 | $0 | $0 | $15,000 | $15,000 |
| Estimated parts and accessories profit (not including OH) 35% | $0 | $0 | $0 | $0 | $0 | $0 | $5,250 | $5,250 |
| Profit on sales per month | $0 | $0 | $0 | $16,000 | $58,000 | $71,000 | $111,250 | $181,250 |
| **Net Profit/Loss for the company** | -$62,176 | -$88,266 | -$89,016 | -$69,266 | -$43,182 | -$37,392 | -$22,092 | $33,388 |

Confidential – Do not share



Frictionle...

4

# January and February Costs

Actual Jan and Feb numbers, March has not been closed yet.

So far we are performing very well to initial the budget.

| | Month 8 | Month 9 |
| --- | --- | --- |
| | 1/1/2013 | 2/1/2013 |
| | Year 1 | Year 1 |
| **Fixed Personnel Costs** | | |
| Dan Banjo | $10,000 | $10,000 |
| New Product Development Engineer | $5,415 | $5,415 |
| Marketing and advertising (Bruce) | $2,500 | $5,000 |
| Jr. Sales Manager (Andrew) | $5,000 | $5,000 |
| IT Engineer (Rex) | $2,000 | $1,500 |
| Accounting (contract) | $0 | $1,000 |
| Employment taxes / Healthcare (State and Federal) | $7,973 | $8,933 |
| SUM of Personnel Costs (monthly) | $32,888 | $36,848 |
| **Fixed and Variable Costs EXCLUDING Personnel** | | |
| Company offices and small starting warehouse | $15,876 | $15,876 |
| Utilities monthly for warehouse | $869 | $925 |
| General office expenses (phones, fax, copier, internet) yearly | $715 | $750 |
| Insurance on liability and space, equipment and product sold | $0 | $500 |
| Travel international per year @ 4K / week | $9,000 | $0 |
| Domestic travel to sell and launch product | $1,500 | $5,000 |
| Samples from suppliers yearly (assumed to be free from CIU) | $0 | $500 |
| Air Freight (lbs. of freight per year @ $4/lb.) (assumed free from CIU) | $0 | $500 |
| Ship samples to customer domestically | $850 | $1,000 |
| Legal/Patent work (Lawyers only) | $1,500 | $0 |
| SUM of Fixed & Variable Costs EXCLUDING Personnel (monthly) | $30,310 | $25,051 |
| **Start Up / Growing Costs** | | |
| Computers, high end CAD computers at 4k/ea. | $2,490 | $0 |
| Warehouse / shipping equipment tools | $620 | $2,500 |
| SUM of Start Up / Growing Costs (monthly) | $3,110 | $2,500 |
| **Monthly Sum of Expenses** | **$66,308** | **$64,399** |
| Initial projection for expenses | $131,115 | $124,528 |
| Under budget | $64,807 | $60,129 |
| | | |
| **Monthly Sum of Expenses** | **$66,308** | **$64,399** |

Frictionless World

Case:19-01282-MER   Doc#:28-1   Filed:11/25/19   Entered:11/25/19 16:28:17   Page83 of 100

Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page34 of 197

# 2013 Log Splitter Projections

- Add 1,000-2,000 units in stock in Colorado.

- Work with TSC and other retailers on in-store tests

- Place product on-line retail.

- Volume for this year will be low but we need to be in position to have product in stock for fulfillment when other suppliers fall down.

- 2014 will be a strong year for us after we ramp up in 2013. Need full support of CIU.



**Frictionless**World

Confidential – Do not share

6

Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page35 of 197

# 2014 Log Splitter Projections

- Goal is to sell 15,000 log splitters in 2014.

  — 7,000 to Menards

  — 3,000 to Midstates members

  — 1,000 in foreign countries (AUS/NZ/Canada)

  — 3,000 to the dealer networks

  — 1,000 to online accounts

- If TSC, HomeDepot or Lowes add our products in 2014 this number will jump by 10,000-20,000. We should prepare to be able to offer these products to these accounts. Competition here is not SpeeCo it is other domestic suppliers and the Chinese company SuperPower.

- We should keep 2,000 units in stock in Colorado and 5,000-7,000 units in stock at CIU. So CIU should plan to build about 20,000 units in 2014.

- Reviews for Menards, HomeDepot and Lowes will be in April of 2014. So there is an opportunity we may surpass 15,000 units easily.



Frictionless**World**

Confidential – Do not share

7

# TSC Plan

- 24 store test will begin in April of 2013.
- Will be branded DHT to start with plan to go to Countyline if successful.
- Success means we could displace Speeco/Blount right away.
- This could result in $30m-50m of business.
- CIU to stop supplying Speeco/Blount immediately.
- This will push TSC to make a decision that will help grow our business very quickly.
- Very important that this business for splitters, post hole diggers and farm/ranch products moves to us as opposed to Speeco/Blount.
- TSC would likely be our biggest customer.



Frictionless World

Confidential – Do not share

8

Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page37 of 197

# DHT Hydraulic Log Splitters

**35 Ton**
Dealer only

**34 Ton**
Retail only

**28 Ton**
Dealer only

**27 Ton**
Retail only

**22 Ton**
Dealer only

**22 Ton**
OPP Retail

**3 Point**

Accessories
4 way wedge system
Log catcher (currently standard with all units)
Stroke reduce





Frictionless World

Confidential – Do not share

9

# CIU New Product Development for 2013

- Rear Tine Counter Rotating Tiller
    - USA EAU 100,000
    - Displace MTD and Ardisam
    - Few Chinese manufactures
    - Most are USA domestic
    - Follow development with Front tine tiller
- Post Hole Diggers
    - Need full line
    - 3 models of PHD, 6+ augers
- OPP and 34 Ton Log Splitters
    - Develop these splitters and a kinetic option
- High Wheeled String Trimmer
    - Perfect addition to the line up.  Focus on Spring products to balance log splitter seasonality.  EAU 20,000



FrictionlessWorld

Confidential – Do not share

10

# Legal structure per operating agreement

- CIU/ZL investments owns 90% of Frictionless, D. Banjo owns 10%.

- Frictionless and CIU/ZL investments will have the rights to perpetually use all patents developed by Frictionless World for products to be manufactured by CIU. Doesn't include trademarks, other IP which are registered to FW.

- Products manufactured by CIU sold through F to FW. Per agreement D.Banjo can run FW as a means to grow products produced by CIU, selling F's products through it.

- Per the agreement FW will be the forward facing company to the customers and will be the parent to the sub-company Frictionless.

- Reasons for this have been outlined in the past:
  - Inability for a Chinese owned company to get loans, leases, product liability insurance. In addition to customer requirements needing the supplying company US owned. Allows for future credit to be acquired by FW in the USA.
  - Employees of FW may have ownership of FW but not F.

- D.Banjo / FW to use 5-10% revenue and 5% expense up lift to purchase products from other manufacturers (5 ton electric log splitter, chainsaws, cultivators, generators) in an effort to grow the FW business which will in turn create growth for CIU / Frictionless.

- D.Banjo / FW to make every effort to increase the number of products made by CIU.

- Mr. Li to appoint CFO for F, and other positions in F per the agreement.

- CIU must stop selling to competitors immediately and strictly focus on the growth and prosperity of Frictionless.  Only way to be successful.



Frictionless**World**

Confidential – Do not share

11

Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page40 of 197



# Structure

Retail Customers

US credit and banking relationships

Leases and property to run the business

## Frictionless **World**

Patents/IP/Trademarks created by FW

Development of products with other manufacturers

Engineering, sales and distribution by FW

Employees and functions

### Frictionless

#### CIU

Use of patents, tooling, Asian suppliers for use by CIU/F. Shipping from CIU to USA.

Legal issues, expenses.

Insurance both liability and employee

Online and Worldwide Customers

Frictionless World

Frictionless is a component of the parent company FW. FW is the forward facing entity for the supplier F/CIU.

12

Confidential – Do not share

Case:19-01282-MER   Doc#:1-1   Filed:10/09/19   Entered:10/09/19 13:29:05   Page41 of 197

# Sales Flow



CIU

COGS

Frictionless

Landed Cost

FrictionlessWorld

Sales price

Payment to CIU less share

90-95%

100%

Uplift of expenses 5% back to F from FW

Products not made by CIU or those that CIU can not make, does not want to make, or can not make effectively are bought by FW and sold to retail. Example: 5 ton electric log splitter, chainsaw, etc. Funds used approx. equal to sharing ratio.

CIU manufactures log splitters, post hole digger, trimmers, etc. CIU sells them to F. FW buys them from F and sells to the customers worldwide. FW returns 90-95% of the price sold to the retail customer back to F.
Remaining amount is used to buy other products that CIU can't make.
Additionally FW may uplift the expenses 5-10% so that there are sufficient funds to grow the collective business. F and CIU ultimately benefit because more and more products will be developed for CIU. Should be sufficient margin for both companies to be profitable.

FrictionlessWorld

FrictionlessWorld

13

Confidential – Do not share

# Goals for Frictionless

- Develop new and exciting products for the worldwide market that can be made at CIU.

- Expand the capabilities and types of products that can be manufactured at CIU to better balance the business.

- Remove the dependency from Speeco and Blount as sales and distribution channels for CIU.

- Add new machines and operations that can be performed at CIU.  CNC, Laser, final whole good assembly lines.  Things that do not exist now.

- Create investment vehicle for Mr. Li to have a company in the USA.
Allows for family members to live in the USA and contribute to its growth.

- Become profitable by the 2nd year of operation.

- Have fun and enjoy life.



Frictionless**World**

Confidential – Do not share

14

Case:19-01282-MER Doc#:1-1 Filed:10/09/19 Entered:10/09/19 13:29:05 Page43 of 197

15

## Questions

Confidential – Do not share



Frictionless**World**

Case 1:19-cv-03583-LTB   Document 1   Filed 12/17/19   USDC Colorado   Page 108 of 114
Case 1:19-cv-02321-MERR   Doc #:1-28   Filed 10/09/19   Entered 10/09/19 13:29:25   Page 96 of 97
100





Case 1:19-cv-03583-LTB   Document 1   Filed 12/17/19   USDC Colorado   Page 110 of 114
Case 1:19-cv-01823-MBR   Doc #:28-1 Filed: 10/09/19 Entered: 10/09/19 13:29:25 Page 95 of 97
100

**E-Filed**

Document must be filed electronically.
Paper documents will not be accepted.
  Document processing fee
Fees & forms/cover sheets
  are subject to change.
To access other information or print
  copies of filed documents,
  visit www.sos.state.co.us and
  select Business Center.

$50.00

Colorado Secretary of State
Date and Time: 05/14/2012 09:31 PM
ID Number: 20121269069

Document number: 20121269069
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization
filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

   **Frictionless World LLC**

   *(The name of a limited liability company must contain the term or abbreviation
   "limited liability company", "ltd. liability company", "limited liability co.", "ltd.
   liability co.", "limited", "l.l.c.", "llc", or "ltd.". See §7-90-601, C.R.S.)*

   **(Caution:** *The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

   Street address    1942 Broadway
                          *(Street number and name)*
                     Suite 210

                     Boulder      CO    80302
                        *(City)*       *(State)*    *(ZIP/Postal Code)*
                            United States
                    *(Province – if applicable)*     *(Country)*

   Mailing address
   **(leave blank** if same as street address)
                          *(Street number and name or Post Office Box information)*

                        *(City)*       *(State)*    *(ZIP/Postal Code)*

                    *(Province – if applicable)*     *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered
   agent are

   Name
     (if an individual)
                        *(Last)*       *(First)*      *(Middle)*    *(Suffix)*

   **OR**

     (if an entity)    Frictionless World LLC
   **(Caution:** Do not provide both an individual and an entity name.)

   Street address    1942 Broadway
                          *(Street number and name)*
                     Suite 210

                     Boulder      CO    80302
                        *(City)*       *(State)*    *(ZIP C*

**Exhibit 3**

Mailing address
(**leave blank** if same as street address)

_____
*(Street number and name or Post Office Box information)*

_____

_____  CO  _____.
*(City)*       *(State)*       *(ZIP Code)*

*(The following statement is adopted by marking the box.)*

☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name
(if an individual)

_____  _____  _____  _____
*(Last)*      *(First)*     *(Middle)*    *(Suffix)*

**OR**

(if an entity)   Frictionless World LLC

*(Caution: Do not provide both an individual and an entity name.)*

Mailing address   1942 Broadway

*(Street number and name or Post Office Box information)*

Suite 210

Boulder _____  CO   80302_____
*(City)*      *(State)*    *(ZIP/Postal Code)*

United States .

*(Province – if applicable)*      *(Country)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ The limited liability company has one or more additional persons forming the limited liability
company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*

☑ one or more managers.

**OR**

☐ the members.

6. *(The following statement is adopted by marking the box.)*

☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date.  Stating a delayed effective date has
significant legal consequences.  Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are _____.
*(mm/dd/yyyy hour:minute am/pm)*

**Notice:**

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| Smith | Alexis | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

1942 Broadway
*(Street number and name or Post Office Box information)*

Suite 210

| Boulder | CO | 80302 |
|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |

United States.

| | |
|---|---|
| *(Province – if applicable)* | *(Country)* |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

## USPTO PATENT FULL-TEXT AND IMAGE DATABASE

[ Home ] [ Quick ] [ Advanced ] [ Pat Num ] [ Help ]

[ Bottom ] [ View Cart ]

*Searching US Patent Collection...*

**Results of Search in US Patent Collection db for:**
**(AN/"frictionless world" OR AANM/"frictionless world")**: 15 patents.
*Hits 1 through 15 out of 15*

[ Jump To ] _____

[ Refine Search ] AN/"frictionless world" OR AANM/"frictionless world"

| | PAT. NO. | | Title |
|---|---|---|---|
| 1 | 10,273,755 | T | Convertible framework for post hole digger |
| 2 | 10,220,541 | T | Log splitting apparatus having log splitter frame with stripper plates |
| 3 | 10,118,531 | T | Power equipment shipping |
| 4 | 10,086,741 | T | Power equipment shipping |
| 5 | 10,023,093 | T | Power equipment shipping |
| 6 | 10,011,040 | T | Stroke reducer for log splitting apparatus |
| 7 | 9,743,582 | T | Integrated string and blade trimmer system |
| 8 | D789,997 | T | Stroke limiter for a log splitter |
| 9 | 9,381,668 | T | Log splitting apparatus having log splitter frame with stripper plates |
| 10 | D757,122 | T | Brush mower |
| 11 | D757,121 | T | Walk behind string trimmer |
| 12 | D706,843 | T | Splitting wedge for log splitter |
| 13 | D706,319 | T | Splitting wedge system for log splitter |
| 14 | D706,318 | T | Splitting wedge base for log splitter |
| 15 | D681,701 | T | Log splitter beam |

[ Top ] [ View Cart ]

[ Home ] [ Quick ] [ Advanced ] [ Pat Num ] [ Help ]



Exhibit
4

PreGrant Publications Database Search Result: AN/"frictionless world" OR AANM/"frictionless world"; Sect2=HITOF...

Case 1:19-cv-03583-LTB Document 1-1 Filed 12/17/19 USDC Colorado Page 114 of 114
Case 1:19-cv-01223-MEH Document 1-28 Filed 10/09/19 Entered 10/09/19 19:29:25 Page 99 of 100
100



# US PATENT & TRADEMARK OFFICE
## PATENT APPLICATION FULL TEXT AND IMAGE DATABASE

| Help | Home | Boolean | Manual | Number | PTDLs |

| Bottom | View Shopping Cart |

*Searching AppFT Database...*

**Results of Search in AppFT Database for:**
**AN/"frictionless world" OR AANM/"frictionless world"**: 8 applications.
*Hits 1 through 8 out of 8*

| Jump To |

| Refine Search | AN/"frictionless world" OR AANM/"frictionless world"

| | **PUB. APP. NO.** | **Title** |
|---|---|---|
| 1 | 20180339424 | STROKE REDUCER FOR LOG SPLITTING APPARATUS |
| 2 | 20180297504 | POWER EQUIPMENT SHIPPING |
| 3 | 20170210271 | POWER EQUIPMENT SHIPPING |
| 4 | 20170210270 | POWER EQUIPMENT SHIPPING |
| 5 | 20160318206 | STROKE REDUCER FOR LOG SPLITTING APPARATUS |
| 6 | 20160297095 | LOG SPLITTING APPARATUS HAVING LOG SPLITTER FRAME WITH STRIPPER PLATES |
| 7 | 20150107118 | INTEGRATED STRING AND BLADE TRIMMER SYSTEM |
| 8 | 20140124097 | LOG SPLITTING APPARATUS HAVING LOG SPLITTER FRAME WITH STRIPPER PLATES |

| Top | View Shopping Cart |

| Help | Home | Boolean | Manual | Number | PTDLs |